**W.L. HARRIS, Plaintiff–Appellant,**

v.

**UNITED STATES of America, Defendant–Appellee.**

No. 93–7204.

United States Court of Appeals, Fifth Circuit.

May 4, 1994.

---

Preston D. Rideout, Jr., Greenwood, MS, for plaintiff-appellant.

Patricia Driver Rogers, Asst. U.S. Atty., Robert Q. Whitwell, U.S. Atty., Oxford, MS, Ted L. Elders, U.S. Dept. of Agriculture, Office of General Counsel, Atlanta, GA, for defendant-appellee.

---

\* Circuit Judge of the Eleventh Circuit, sitting by designation.

Before HENDERSON,\* SMITH, and EMILIO M. GARZA, Circuit Judges.

EMILIO M. GARZA, Circuit Judge:

Plaintiff W.L. Harris brought suit in federal district court seeking a declaratory judgment that the Farmers Home Administration ("FmHA") had unlawfully placed wetland easements on his land and that the property declared by the FmHA to encompass wetlands actually did not. The district court denied relief, 820 F.Supp. 1018. Harris now appeals, and we affirm.

## I

In 1987, the Grenada Bank of Mississippi foreclosed on 1,893 acres of farmland owned by Harris. The FmHA, which held a junior lien on the property, successfully bid for the property at the subsequent sale held by the bank. The following year, the United States Fish and Wildlife Service ("FWS"), pursuant to a request from the FmHA, inspected the property, found that it contained large areas of wetlands, and recommended that the FmHA impose wetland conservation easements on approximately 1,005 acres. In June 1988, the FmHA offered to let Harris lease-back or buy-back the farmland, subject to conservation easements imposed on the 1,005 acres. Harris opted to repurchase the land for $371,700, which was the land's fair market value with the conservation easements in place.[1] The wetland easements prevent Harris from farming the land and allow the FWS to manage water flow and other conditions on the land.

Harris subsequently sued the FmHA, contending that it had no authority to impose the wetland conservation easements. Harris alternatively contended that the FmHA's decision to impose the easements was arbitrary and capricious because much of the property designated as wetlands did not possess scientifically-accepted indicators of wetland status. The district court granted summary judgment for the United States as to Harris' first contention, holding that the FmHA had the authority to place wetland easements on the property that he repurchased. After a bench

---

1. At the time of foreclosure, the property had an appraised value of $683,000.

trial regarding the second claim, the district court found that the FmHA did not act in an arbitrary or capricious manner when imposing the easements because the land at issue constituted wetlands. Harris now appeals, contending that the district court erred with respect to both claims.

## II

Executive Order 11990 requires that all federal agencies "take action to minimize the destruction, loss or degradation of wetlands, and to preserve and enhance the natural and beneficial values of wetlands in carrying out the agency's responsibilities for (1) acquiring, managing, and disposing of Federal lands and facilities...." Exec. Order No. 11990, § 1(a), 42 Fed.Reg. 26,961 (1977), *reprinted as amended in* 42 U.S.C. § 4321 note (1988). Moreover,

> [w]hen Federally-owned wetlands or portions of wetlands are proposed for lease, easement, right-of-way or disposal to non-Federal public or private parties, the Federal agency shall (a) reference in the conveyance those uses that are restricted under identified Federal, State or local wetlands regulations; and (b) attach other appropriate restrictions to the uses of properties by the grantee or purchaser and any successor, *except where prohibited by law;* or (c) withhold such properties from disposal.

*Id.* § 4 (emphasis added). Both parties agree that this order, which was issued by President Carter pursuant to statutory authority,[2] has the force and effect of a statute enacted by Congress. *See Eatmon v. Bristol Steel & Iron Works, Inc.,* 769 F.2d 1503 (11th Cir.1985). The FmHA contends that the order authorized it to impose the wetland conservation easements at issue. Harris, on the other hand, argues that the FmHA was "prohibited by law"—i.e., prohibited by the Food

Security Act of 1985, Pub.L. No. 99–198, 99 Stat. 1526 (1985), and the Agricultural Credit Act of 1987, Pub.L. No. 100–233, 101 Stat. 1669 (1988)—from imposing the challenged easements.

### A

Harris initially contends that 7 U.S.C. § 1985(e),[3] which was added by the Agricultural Credit Act, prohibits the FmHA from imposing wetland easements on the property at issue because "[n]o where in the language of [§ 1985] is the Secretary given the right to condition the exercise of leaseback/buyback rights on the acceptance of a wetlands easement." In essence, Harris' argument is that Congress prohibited the FmHA from imposing wetland conservation easements by not specifically codifying the FmHA's authority to do so. Nonetheless, there is no question that, in the absence of statutory authority to the contrary, Executive Order 11990 binds the FmHA. Thus, the issue presented is whether Congress *sub-silentio* rendered Executive Order 11990 void as it pertains to the buyback program by not specifically codifying the FmHA's authority to impose wetland easements. Harris relies upon four statutory provisions to support his contention that Congress barred the FmHA from imposing wetland conservation easements on property subject to the borrower's redemption rights.

### 1

■ Harris first asserts that language found in § 1985(e)(7) supports his interpretation of § 1985(e)(1)(A). Subsection (7) states:

> In the case of farmland administered under this chapter that is highly erodible land (as defined in section 3801 of Title 16), the Secretary may require the use of specified conservation practices on such land as

---

2. President Carter issued Order 11990 pursuant to and in furtherance of the National Environmental Policy Act of 1969, 42 U.S.C. § 4321 *et seq.* (1988).

3. This section provides redemption rights to borrowers from whom the FmHA acquired farm property that was used to secure loans made by the FmHA:

> During the 180–day period beginning on the date of acquisition, the Secretary shall allow the borrower-owner ... to purchase or lease such property, if the borrower-owner has acted in good faith with the Secretary, as defined in the regulations issued by the Secretary, in connection with such loan.

7 U.S.C. § 1985(e)(1)(A)(i) (Supp. IV 1993).

a condition of the sale or lease of such land.

7 U.S.C. § 1985(e)(7). Because Congress did not similarly codify the FmHA's authority to impose such conditions of sale with regard to wetlands, Harris concludes that subsection (7) provides "strong evidence of Congress' intent not to subordinate the leaseback/buyback rights to any affirmative duty that the FmHA might have had under Executive Order 11990 to place wetlands easements on inventory land." However, an alternative— and more plausible—reading of Congress' inaction is that Congress felt no need to codify the FmHA's power to impose wetland easements because Executive Order 11990 already obliged the FmHA to do so. Consequently, we find Harris' contention unavailing.

### 2

■ Harris next argues that the language of 7 U.S.C. § 1997, which authorizes the FmHA to acquire conservation easements from delinquent borrowers, supports his reading of § 1985(e)(1)(A). Section 1997 allow the FmHA to "purchase" such easements

> by canceling that part of the aggregate amount of such outstanding loans of the borrower held by the Secretary ... that bears the same ratio to the aggregate amount of the outstanding loans of such borrower held by the Secretary ... as the number of acres of the real property of such borrower that are subject to such easement bears to the aggregate number of acres securing such loans.

7 U.S.C. § 1997(e). Harris concludes that because "Congress intended for the FmHA to 'purchase' conservation easements from distressed borrowers, Congress did not intend to empower the Secretary of Agriculture to extract a conservation easement by coercion from a farmer exercising his leaseback/buyback rights." Harris, however, overlooks the fact that the § 1997 program could not be used in this case because Grenada Bank, not the FmHA, foreclosed upon Harris' farm. Thus, the FmHA could not have purchased the easements from Harris

as Harris did not own the property when the FmHA acquired it. Accordingly, Harris' reliance upon § 1997 is misplaced.

### 3

■ Harris next points to § 616 of the Agricultural Credit Act, which allows the FmHA, for conservation purposes, to transfer to a Federal or State agency any real property administered by the FmHA "with respect to which the rights of all prior owners and operators have expired." 7 U.S.C. § 2002. Harris argues that because "Congress expressly made leaseback/buyback rights superior to the right of the FmHA to transfer land under the 616 program ..., it would seem logical that Congress also intended to make leaseback/buyback rights superior to the right of FmHA to exercise its authority under Executive Order 11990 to enhance wetlands." Harris fails to demonstrate, however, that the imposition of wetland conservation easements pursuant to Executive Order 11990 is inconsistent with the § 616 program. Indeed, Congress now has statutorily authorized the FmHA to impose easements on inventory land subject to the redemption provision of § 1985(e)(1)(A), *see* part II.A.4 *infra*, while at the same time retaining the § 616 program. Consequently, we find Harris' contention without merit.

### 4

■ Harris finally contends that 7 U.S.C. § 1985(g), which Harris concedes is not applicable here,[4] supports his interpretation of § 1985(e)(1)(A). Subsection (g) allows the FmHA to "establish perpetual wetland conservation easements to protect and restore wetlands or converted wetlands that exist on inventoried property, as determined by the Secretary in accordance with title XII of the Food Security Act of 1985 (16 U.S.C. § 3801 et seq.)." 7 U.S.C. § 1985(g)(1) (Supp. IV 1993). Harris submits that Congress charged the FmHA with the duty to impose such easements because the FmHA did not have such a duty previously. Harris, however, fails to recognize that Congress, in adopting subsection (g), recognized the prior exist-

---

**4.** Congress added § 1985(g) as part of the Food, Agricultural, Conservation, and Trade Act of 1990, Pub.L. 101–624, § 1813(h)(1), 104 Stat. 3821 (1990).

ing authority of the FmHA to impose wetland conservation easements. For example, the relevant Senate report noted that the enactment of subsection (g) would

> alleviate[ ] a problem with *the current use of U.S. Fish and Wildlife Service easements on inventory property*.... Easements can reduce the productive value of the property in some cases. For the FmHA borrower/owner who conveyed his or her property to the agency, and who exercises his or her redemption rights, the land could be worth less than when it was conveyed.

S.Rep. No. 357, 101st Cong., 2d Sess. 243–44 (1990) (emphasis added), *reprinted in* 1990 U.S.C.C.A.N. 4656, 4897–98. Thus, that Congress added § 1985(g) does not support Harris' contention that the FmHA lacked the authority to impose wetland easements on property subject to the buyback program. Instead, Congress enacted subsection (g) to restrict the FmHA's already existing authority to impose wetland easements on federally-owned property. Accordingly, the enactment of § 1985(g) actually cuts against Harris' proposed interpretation of § 1985(e)(1)(A).

**B**

■ Harris has produced no evidence suggesting that Congress intended to repeal Executive Order 11990 as it applies to FmHA inventory land. *See Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 490, 105 S.Ct. 3275, 3281, 87 L.Ed.2d 346 (1985) (noting that if Congress wishes to change the law in a "novel" way, some mention of that intent should be present in the statute or its legislative history); *Farmer v. Employment Sec. Comm'n of N.C.*, 4 F.3d 1274, 1283–84 (4th Cir.1993) ("It is settled law that repeal of a statute by implication is not favored."). Moreover, Executive Order 11990 and 7 U.S.C. § 1985(e)(1)(A) do not conflict such that the two cannot operate concurrently. *See* 1A Norman J. Singer, Sutherland Statutory Construction § 23.09, at 338 (5th ed. 1993) (noting that "in the absence of some affirmative showing of an intention to repeal, the only permissible justification for a repeal by implication is when the earlier and later statutes are irreconcilable or if the later act covers the whole subject of the earlier one and is clearly intended as a substitute"). Furthermore, subsection (e)(1)(B) states that "[a]ny purchase or lease under [§ 1985(e)(1)(A) ] *shall* be on such terms and conditions as are established in regulations promulgated by the Secretary." 7 U.S.C. § 1985(e)(1)(B) (emphasis added). The regulations promulgated by the FmHA explicitly require that wetland conservation easements be placed on land sold pursuant to the buyback program authorized by § 1985.[5] Accordingly, we cannot conclude that Congress, when authorizing the redemption program, intended to bar the FmHA from imposing wetland conservation easements under Executive Order 11990.[6]

**III**

**A**

■ Harris' second claim is that the FmHA's designation of certain areas of his property as wetlands constitutes arbitrary

---

5. For example, the regulation containing "the policies and procedures pertaining to the Farmer Programs Leaseback/Buyback Program," 7 C.F.R. § 1951.911(a), provides that "[i]f the property contains lands that are wetlands and/or floodplains, the prospective lessee or purchaser will be informed by FmHA of its presence and location, along with the USDA restrictions regarding its use...." *Id.* § 1951.911(a)(8)(iii); *see also id.* § 1955.137(a)(1) ("Executive Order 11988, 'Floodplain Management,' and Executive Order 11990, 'Protection of Wetlands,' require the conveyance instrument for inventory property in floodplains or wetlands which is proposed for lease or sale to specify those uses that are restricted under identified Federal, State, and local floodplain or wetlands regulations as well as other appropriate restrictions."); *id.* § 1955.-139(a)(3)(v) ("For [farmer program] cases except when FmHA has an affirmative responsibility to place a conservation easement upon a farm property, easements ... will not be established unless either the rights of all prior owner(s) have been met or the prior owner(s) consents to the easement. Examples of instances where an affirmative responsibility exists to place an easement on a farm property include wetland and flood conservation easements required by § 1955.137 of this subpart....").

6. Although this is an issue of first impression in this Circuit, our colleagues in the Ninth Circuit have reached the same conclusion. *See Miles v. Yeutter*, 956 F.2d 275 (9th Cir.1992) (table: unpublished opinion).

and capricious action under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706. "Under the APA, the administrative record is reviewed to determine whether the challenged action was arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law...." *State of Louisiana v. Verity*, 853 F.2d 322, 326 (5th Cir. 1988); *see* 5 U.S.C. § 706(2)(A). Under this "very narrow" standard of review, we may not "weigh the evidence in the record pro and con." *Verity*, 853 F.2d at 327. Instead, "our role is to review the agency action to determine whether the decision 'was based on a consideration of the relevant factors and whether there was a clear error of judgment.'"[7] *Id.* (quoting *Motor Vehicles Mfrs. Ass'n of the United States v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 2966–67, 77 L.Ed.2d 443 (1983)). "Thus, if the agency considers the factors and articulates a rational relationship between the facts found and the choice made, its decision is not arbitrary or capricious." *Id.* "Indeed, the agency's decision need not be ideal, so long as it is not arbitrary or capricious, and so long as the agency gave at least minimal consideration to relevant facts contained in the record." *Id.* (footnote omitted).

The Executive Order defines "wetlands" as those areas that are inundated by surface or ground water with a frequency sufficient to support and under normal circumstances does or would support a prevalence of vegetative or aquatic life that requires saturated or seasonally saturated soil conditions for growth and reproduction. Wetlands generally include swamps, marshes, bogs, and similar areas such as sloughs, potholes, wet meadows, river overflows, mud flats, and natural ponds.

Exec. Order No. 11990, § 7(c). While the Order does not provide a methodology for determining whether a specific parcel of land constitutes wetland, the parties nevertheless agree that property constitutes a wetland area only when both a wetland hydrology and hydric soils are present and the area's vegetation is predominately hydrophytic.[8] Pursuant to those criteria, Charles McCabe, a FWS biologist, made the initial recommendation regarding Harris' property.[9] Harris contends that the process by which McCabe produced his proposed delineation was so flawed as to render McCabe's conclusions, the FWS's wetland delineation, and the FmHA's decision to implement the FWS's delineation arbitrary and capricious agency action.

7. Thus, we may not consider evidence outside the administrative record when determining whether to uphold agency action. *Verity*, 853 F.2d at 327 n. 8; *see also Ascaro, Inc. v. United States E.P.A.*, 616 F.2d 1153, 1160 (9th Cir.1980) (If the reviewing court finds it necessary to go outside the record, "[c]onsideration of the evidence to determine the correctness or wisdom of the agency's decision is not permitted...."). However, administrative officials who participated in the action may explain their actions. *See Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 420, 91 S.Ct. 814, 825, 28 L.Ed.2d 136 (1971).

8. To fulfill the hydrophytic vegetation parameter, plants classified as wetlands species must constitute in excess of 50% of the land's vegetation. Hydric soils are soils that are oxygen deficient, or anaerobic. Soils generally become anaerobic if saturated by water for relatively lengthy periods of time. Wetland hydrology exists in areas that are or under normal circumstances would be inundated by surface or ground water.

Harris contends that all three factors must be observed before property can be considered a wetland area. FWS experts, on the other hand, testified that the presence of one factor may be the basis for inferring the presence of one of or both the other factors. As this appears to be the typical battle of the experts, we defer to the agency's interpretation. *See Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 378, 109 S.Ct. 1851, 1861, 104 L.Ed.2d 377 (1989) ("When specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive."); *Baltimore Gas & Elec. Co. v. Natural Resources Defense Council, Inc.*, 462 U.S. 87, 103, 103 S.Ct. 2246, 2255, 76 L.Ed.2d 437 (1983) ("When examining this kind of scientific determination ..., a reviewing court must generally be at its most deferential.").

9. In 1987, the FmHA and the FWS entered into a memorandum of understanding providing that, upon request, the FWS would inspect land held by the FmHA and make recommendations as to the necessity and desirability of imposing wetland easements or other restrictions on the property. FWS recommendations, however, are not binding on the FmHA.

## B

Before conducting an on-site inspection of the property at issue, which consisted of four separate tracts of land, McCabe examined the topographical maps and aerial photographs for the applicable area to determine the boundaries of Harris' land. McCabe also examined the relevant soil surveys prepared by the United States Soil Conservation Service ("SCS") to ascertain whether the soils in the region surrounding Harris' property were hydric or nonhydric. McCabe further examined flood data accumulated by the Corps of Engineers to discern whether Harris' property fell within a flood plain. McCabe and two other biologists—one from the Mississippi Department of Wildlife Conservation and one from FWS Division of Wildlife Refuges—subsequently inspected Harris' land, spending a total of approximately seven hours on the four tracts. McCabe then formulated proposed wetland delineations, which he discussed with FWS Acting Field Supervisor Robert Barkley. McCabe, accompanied by Barkley, later inspected Harris' property a second time. After the latter inspection, Barkley, and the review committee of the FWS regional office, approved McCabe's report and recommendations that wetland easements be imposed on all four tracts of land.[10] The FmHA accepted the recommendations without change. Harris, relying primarily on the testimony of his expert, contends that McCabe's delineation is deficient for a multitude of reasons.[11]

Harris initially contends that McCabe failed to employ a scientifically acceptable methodology when formulating his wetland easements recommendations because he was not aware of and did not refer to FWS publications dealing with wetland delineation. McCabe, however, testified that he followed the FWS-approved three parameter approach—which requires an examination of the land's vegetation, hydrology, and soils—when determining whether Harris' property included wetlands, although he admittedly did not specifically refer to the publications when formulating his recommendations. Although Harris attempted at trial to discredit McCabe, the district court chose to credit McCabe's testimony. On the cold record before us, we cannot say the district court erred in doing so. *See Anderson v. Bessemer City,* 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985) (noting that we must give "due regard to the trial court to judge the credibility of the witnesses"). Moreover, while McCabe may not have been as experienced in delineating wetlands as Dr. Heineke, McCabe did have sufficient expertise in wetland classification in that, at the time he inspected Harris' property, he had eighteen years experience dealing with wetlands and wetland issues and had delineated forty-four other properties.

Harris next argues that the FWS wetland delineation was fatally flawed because McCabe failed both to procure soil samples from the four tracts and to accurately measure whether the vegetation present on all four tracts was predominately hydrophytic.[12] However, the SCS soil surveys consulted by McCabe prior to his on-site inspection evidenced the presence of hydric soils on tracts I, II, and III. Moreover, based on prior experience, the SCS and the FWS previously had determined that, with very few exceptions, hydrophytic vegetation predominated on all land situated within the Mississippi

---

**10.** McCabe designated 40 acres of tract I, 18 acres of tract II, 412 acres of tract III, and 534.7 acres of tract IV as either wetlands or wetland buffer areas. McCabe found no wetland areas in tracts V and VI, which Harris purchased and then sold before bringing the present action.

**11.** Dr. Thomas Heineke, Harris' expert, testified that McCabe failed to consider that wetland hydrology existed on tracts I and II only because man-made water control structures caused water to inundate those tracts. However, as the district court noted, the fact that wetland may have been artificially created does not mean that they are excluded from the definition of wetlands

found in Executive Order 11990. *Cf. Leslie Salt Co. v. United States,* 896 F.2d 354, 358 (9th Cir.1990) (holding that property constitutes wetlands under the Clean Water Act, which requires that wetland conditions exist "under normal circumstances," regardless of the fact that the wetlands were man-made).

**12.** However, Dr. Heineke, Harris' expert witness, testified that he sometimes identified areas as wetlands without taking soil samples or precisely measuring whether the vegetation was predominately hydrophytic.

delta area.[13] Additionally, maps prepared by the United States Department of Agriculture demonstrated that wetlands surrounded tracts I and III, and flood data gathered by the Army Corps of Engineers demonstrated that tracts I, II, and III were under water for extended periods of time at least one year out of every three.[14] Finally, data obtained from the Corps of Engineers demonstrated that tract IV also was subject to frequent flooding.[15] Consequently, sufficient evidence supports the FmHA's decision to impose wetland easements on Harris' land.

■ Harris next points out that the easements imposed by the FmHA include not only wetlands, but also what the FWS termed "wetland buffer areas."[16] Harris contends that Executive Order 11990 does not allow the FmHA to impose easements on land that does not satisfy the definition of wetlands. McCabe testified that buffer zones contained highly erodible land that, if protected by an easement, would help to both protect and allow proper management of the wetlands. Furthermore, Steve Gard, a FWS employee and an expert in the area of wetland science, explained that the FWS sometimes recommended that the FmHA impose an easement somewhat larger than the actual wetland area because the FWS needed to "block off" an area of land for management purposes. For example, Gard explained that if the FWS designated only "each and every" acre of wetland, an accurate description for surveying and title recording purposes would be impossible. Moreover, if the FWS attempted to manage water movement on such small areas, non-easement lands most likely would be flooded. Based upon such evidence, we conclude that the FmHA did not act arbitrarily or capriciously in imposing wetland easements on property considered to be part of a wetland buffer zone. See S.Rep. No. 357 at 217, reprinted in 1990 U.S.C.C.A.N. at 4871 (noting that buffer areas sometimes are needed "to produce a high quality wetland").

Finally, Harris argues that McCabe's delineation was deficient because McCabe failed to make or keep field notes recording the observations he made while inspecting the four tracts of land.[17] McCabe, however, testified as to both the observations he made while inspecting the property and the conclusions that he reached based on those observations. Moreover, as the district court concluded, evidence presented at trial "clearly indicates a wealth of institutional knowledge

13. McCabe testified that he discovered sesbania growing on tract I and smartweed and spike rush on tract II. He identified smartweed, coffee weed, and black willow as the predominant vegetation on tract III, and smartweed, juncus, and spike rush as the prevalent vegetation on tract IV. Government expert W. Blaine Parker testified that smartweed, juncus, and spike rush are obligate plants; the probability that the property upon which obligate plants are found comprises a wetland area is approximately 99%.

14. When inspecting tract III, McCabe observed "a good deal of water on the land." McCabe further observed that tract I "had been in water" shortly before his inspection and that there was some water on the corner of the tract—apparently the corner to which the FmHA easement pertains. Before submitting his proposed delineations, McCabe also examined "a flood delineation map that showed that [tracts I, II, and III] were in the three year flood [plain]."

15. During his inspection, McCabe observed that tract IV bore several indications of "either flooding or ponding."

16. The easement imposed on tract III covers 329 acres of wetlands and 83 acres of buffer zone. The easement imposed on tract IV includes approximately 90 acres of buffer zone.

17. Harris questioned McCabe as to the whereabouts of McCabe's field notes as follows:

Q: And, it is my understanding that you have no field notes from your [inspection of Harris' property]?
A: I have some slight field notes that were provided to you.
Q: And, did you retain a copy of your field notes?
A: What I have, yes.
. . . .
Q: Could I see your field notes?
A: Okay. All that I still have in the file is right here.
. . . .
Q: Okay. Is it fair to say, then, that all of your field notes from March 22nd and 23rd, 1988, are comprised of some aerial photographs, is that correct?
A: All that I have now is some notes that I made on these aerial photographs.
Q: All right.
A: If there is anything else, it has been lost or gone, or I threw it away.
3 Record on Appeal at 45–47.

available to the agency participants, and upon which they drew[ ] in making the delineations in issue."[18] Thus, while it certainly should not be standard agency procedure to discard such material, the facts presented here demonstrate that the FmHA's decision to implement the wetland delineations recommended by the FWS was not arbitrary and capricious.

## IV

For the foregoing reasons, we AFFIRM the judgment of the district court.

---

18. The institutional knowledge available included the SCS soil surveys consulted by McCabe, the joint SCS–FWS studies indicating that hydrophytic vegetation predominated on all land situated within the Mississippi delta area, and flood data gathered by the United States Department of Agriculture and the Army Corps of Engineers. We further note that under the current statutory scheme, the FmHA apparently need not make on-site inspections but instead may base its wetland delineations on such institutional knowledge. *See* H.R.Conf.Rep. No. 916, 101st Cong., 2d Sess. 910, *reprinted in* 1990 U.S.C.C.A.N.

5286, 5435 (directing the FmHA "to delineate wetland on a map and to make a reasonable effort to make an on-site wetland determination whenever requested by an owner or operator").