# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**
March 10, 2021

Lyle W. Cayce
Clerk

No. 20-60319

Sierra Club; Defenders of Wildlife,

*Petitioners*,

*versus*

United States Department of Interior; Scott de la Vega, *Acting Secretary*, *U.S. Department of the Interior*, *in his official capacity*; United States Fish and Wildlife Service, *an agency of the United States Department of the Interior*; Aurelia Skipwith, *in her official capacity as Director of the United States Fish and Wildlife Service*; Charles Ardizzone, *in his official capacity as Field Supervisor*, *Texas Coastal Ecological Services Field Office, Responsible Official*,

*Respondents*.

Petition for Review of an Order of the
United States Department of the Interior
Agency No. 20191022-5106

Before King, Elrod, and Willett, *Circuit Judges*.

King, *Circuit Judge*:

After years of review, the U.S. Fish & Wildlife Service issued a biological opinion and incidental take statement in connection with the construction and operation of a liquefied natural gas terminal in south Texas. Specifically, the U.S. Fish & Wildlife Service authorized the harm or

No. 20-60319

harassment of one ocelot or jaguarundi and determined that the project would not jeopardize the continued existence of the ocelot or jaguarundi. The Sierra Club and Defenders of Wildlife petition for review of the incidental take statement and biological opinion. For the reasons that follow, we DENY the petition.

**I.**

This challenge asks us to consider whether a decision by Respondent, the U.S. Fish & Wildlife Service (the "Service"), was arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law. Specifically, at issue is whether the Service complied with its obligations under the Endangered Species Act, 16 U.S.C. § 1531[1] *et seq.*, (the "ESA") in authorizing the harm or harassment of one ocelot or jaguarundi and in determining that the proposed project was not likely to jeopardize the continued existence of either cat.

By way of background, we discuss the proposed project, the cats, the relevant portions of the ESA and the federal regulations, and the agency action.

*1. The Project*

Intervenor Annova LNG Common Infrastructure, LLC ("Annova") proposed a $5.2 billion dollar project for the export of liquefied natural gas

---

[1] In broad strokes, the ESA "seeks to protect species of animals against threats to their continuing existence caused by man." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 558 (1992). Specifically, it seeks to protect "endangered" or "threatened" species, that is, "any species which is in danger of extinction throughout all or a significant portion of its range" or "likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." 16 U.S.C. § 1532(6), (20). For species under the jurisdiction of the Secretary of the Interior, like the ocelot and jaguarundi, the Service administers the ESA. *See* 50 C.F.R. § 402.01(b); *see also Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 651 (2007).

from the South Texas Gulf Coast region to international markets. Specifically, Annova proposed the construction and operation of a liquefied natural gas export terminal on a 731-acre parcel on the south bank of the Brownsville Ship Channel in Cameron County, Texas (the "project" or the "Annova project").[2]

## 2. The Ocelot and Jaguarundi

As it turns out, the project would occupy land that is also home to the two species of cats at issue in this case: the ocelot and jaguarundi. The ocelot is an endangered cat whose range spans twenty-two countries "from extreme southern Texas and southern Arizona through the coastal lowlands of Mexico to Central America, Ecuador and northern Argentina." The United States, however, "contains only a small portion of the ocelot's range and habitat." There are approximately fifty ocelots left in the United States with two breeding populations in Cameron and Willacy Counties in Texas. Similarly, the Gulf Coast jaguarundi is another endangered cat whose range includes south Texas, though a jaguarundi has not been seen in south Texas in decades.

At present, the Service has worked to protect the ocelot and jaguarundi by maintaining three national wildlife refuges. Additionally, as relevant for the ocelot, the Service has worked to connect the Cameron County and Willacy County populations with each other and with populations in Mexico.

---

[2] We note at the outset that this project is separate and distinct from the Rio Grande project, which involves the construction and operation of a liquefied natural gas pipeline through several counties in Texas.

No. 20-60319

*3. The ESA and the Federal Regulations*

In a case such as this one, where the Service's biological opinion and incidental take statement are at issue, the court focuses its attention on Sections 7 and 9 of the ESA.

To start, Section 7(a)(2) requires that a federal agency consult with the Service to make sure that any authorized agency action "is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species."[3] 16 U.S.C. § 1536(a)(2); *see also* 50 C.F.R. § 402.14(a) (providing that formal consultation between the action agency and the Service is required where the action agency concludes in its initial review that its action "may affect listed species"). Once the Section 7 formal consultation concludes, the Service must then issue a biological opinion, "setting forth [its] opinion, and a summary of the information on which the opinion is based, detailing how the agency action affects the species," 16 U.S.C. § 1536(b)(3)(A), and using "the best scientific and commercial data available," *id.* § 1536(a)(2).

Although Section 9 of the ESA prohibits takes of listed species, an incidental take statement renders such takes permissible as long as they occur in accordance with the incidental take statement's conditions. 50 C.F.R. § 402.14(i)(5). If the Service concludes that the agency action is not likely to jeopardize the continued existence of the species but will result in some harm

---

[3] The agency whose authorized action is at issue is referred to as the action agency while the Service is the "consulting agency." *See Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 524 F.3d 917, 924 (9th Cir. 2008). In this case, the Federal Energy Regulatory Commission ("FERC") is the action agency as it authorized the project.

or harassment to the species—an incidental take[4]—then the opinion must also set out an incidental take statement. *See* 16 U.S.C. § 1536(b)(4). This statement provides the permissible "amount or extent" of impact on the species from the action. *Id. See* 50 C.F.R. § 402.14(i). And the conditions are "reasonable and prudent measures" designed to minimize the extent of the incidental take. 50 C.F.R. § 402.14(i)(1)(ii). Once the take limit specified in the statement has been exceeded, the action agency must reinitiate Section 7 consultation "immediately." *Id.* §§ 402.14(i)(4), 402.16(a).

*4. Agency Action*

In this case, the Service issued the opinion and statement in connection with FERC's authorization of the Annova project. FERC authorized the project after conducting its environmental analysis, which involved soliciting public comment. From there, FERC prepared an environmental impact statement. Included in FERC's environmental impact statement was a discussion of the project's respective effects on the ocelot and jaguarundi. As part of this process, FERC consulted with the Service, both formally and informally.

In FERC's biological assessment of the project, it concluded that the project likely would have an adverse effect on the cats, and the Service agreed with this conclusion. As a result of this conclusion, formal consultation was required under the ESA. The Service reached its conclusion after it reviewed the proposed project, and in consultation with biologists, considered the project's potential effects on relevant endangered species—the ocelot and the jaguarundi. And the Service's biologists worked with FERC and the

---

[4] A "take" means to "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19).

project's proponents[5] to develop ways to mitigate any effects on the ocelot and jaguarundi. For example, as a result of these consultations, the project proponents agreed to move the site of the terminal 1,800 feet from the original location to minimize harms to the cats' habitats.

After this careful review, the Service issued its opinion and determined that the project would not jeopardize the cats' continued existence, though it may have some adverse effects on the cats. Specifically, the Service determined that the project would likely harm or harass only one cat during construction and the life of the project, and this single "take" was simply not enough to jeopardize the cats' continued existence. The opinion also stated that if the take limit is exceeded, reinitiation of formal consultation is required by 50 C.F.R. § 402.16.

Petitioners Sierra Club and Defenders of Wildlife (collectively, "Petitioners"), however, contend that the opinion and incidental take statement are arbitrary and capricious. Specifically, they argue that there is no clearly defined "take" or trigger for reinitiation of formal consultation once the take of one ocelot or jaguarundi has occurred, and they challenge the Service's no-jeopardy conclusion.

## II.

The court reviews the incidental take statement and biological opinion under the same "narrow and highly deferential standard" set forth under the Administrative Procedure Act. *Medina Cnty. Env't Action Ass'n v. Surface Transp. Bd.*, 602 F.3d 687, 699 (5th Cir. 2010). And the court may not overturn the Service's decision unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

---

[5] Specifically, FERC worked with Annova as well as Annova's consultants.

No. 20-60319

Further, the "court is not to substitute its judgment for that of the agency." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513 (2009) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). Rather, the court "consider[s] whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378 (1989) (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416 (1971)). And the court may nevertheless uphold an agency's decision even if it is "of less than ideal clarity," so long as "the agency's path may reasonably be discerned." *State Farm*, 463 U.S. at 43 (quoting *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974)).

## III.

We first turn to Petitioners' challenge to the incidental take statement. Second, we turn to Petitioners' challenge to the Service's no-jeopardy conclusion. As explained below, we reject these challenges because neither the incidental take statement nor the no-jeopardy conclusion is arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law.

### 1. The Incidental Take Statement is Not Arbitrary and Capricious

Petitioners argue that the incidental take statement is arbitrary and capricious because it fails to (1) set a clear take limit, (2) set an enforceable trigger for reinitiation of formal consultation, and (3) include terms and conditions implementing certain of the reasonable and prudent measures designed to mitigate the effects of the project on the cats. We reject each argument in turn.

First, the incidental take statement clearly specifies the anticipated take of "one endangered cat, (in [the] aggregate, ocelots or a jaguarundi) . . . for construction, and for the life of the project." As such, the

statement specifies "the amount or extent" of the anticipated take, which is all the regulations require. 50 C.F.R. § 402.14(i)(1)(i). Although Petitioners argue that this language in the incidental take statement is ambiguous, we disagree. The phrase "for construction" means that the take of one ocelot could occur at the earliest during construction while "and for the life of the project" delineates the rest of the timeline in which the take could occur. In other words, one take could occur anytime between when construction begins through the life of the project. Therefore, the statement sets a clear take limit.

The reinitiation trigger is similarly clear and enforceable. If the incidental take limit is exceeded, then FERC must reinitiate consultation immediately. *Id.* § 402.14(i)(4). The opinion's reinitiation notice specifies exactly that. If more than one cat is harmed or harassed, then the take limit is exceeded, and consultation must be reinitiated. True enough that the reinitiation notice *also* provides that in the specific instance where the take limit is exceeded by "vehicular mortality," i.e., road-kill, then FERC, Annova, and the Service "will meet to discuss further options." But a plain reading of the reinitiation notice clarifies that such discussion is not in lieu of the required reinitiation of consultation. Rather, such discussion is simply one of Annova's obligations while reinitiation is pending. In other words, in an instance where the take limit is exceeded by a construction or maintenance operation, "the operation causing such take must cease pending reinitiation"; where the take limit is instead exceeded by "vehicular mortality," the obligation pending reinitiation involves a separate discussion.

Further, contrary to Petitioners' argument, the requirement that a *discussion* with the Service must occur if a cat is killed during any twelve-month period does not alter the take limit of a single cat during the life of the project to one take per year. Rather, it merely governs the timing of discussion and, recognizing that a take need not be lethal, provides for

discussion in the event that any cat dies in the project area. Once the take limit is *exceeded*, i.e., two cats are taken, reinitiation of formal consultation is necessarily triggered. *See id.* § 402.14(i)(4). But in the event of even *one* lethal take, which by itself would not exceed the take limit, the Service and the project's proponents will have a discussion. Even with these additional obligations, the statement nevertheless sets a clear and enforceable trigger for reinitiation of formal consultation.

Finally, although the reasonable and prudent measures listed in the statement regarding voluntary conservation measures (specifically the land acquisitions)[6] are not included word-for-word in the terms and conditions, those measures are necessarily already accounted for in several important ways. To begin, the Service's Consultation Handbook expressly provides that where "conservation measures are part of the proposed action," implementing those measures is necessarily required "under the terms of the consultation." *Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*, 698 F.3d 1101, 1114 (9th Cir. 2012) (following and adopting this very principle); *see* 50 C.F.R. § 402.14(h)(1)(i). These voluntary conservation measures were squarely included in the descriptions of the proposed project, and the Service required commitments on these measures before even initiating formal consultation. Additionally, the incidental take statement itself provides that these measures "are non-discretionary, and must be undertaken by FERC and [Annova], so that they become binding conditions of the project." Further still, the record shows that a commitment to fund the acquisition of the land has already occurred, and FERC's authorization requires the implementation of all voluntary conservation measures as part of its certification. Therefore, the failure to include the reasonable and prudent

---

[6] These measures include a voluntary land acquisition of 1,000 acres of land and 250 acres of ocelot habitat.

measures word-for-word in the terms and conditions does not render the incidental take statement arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law.

Based on the foregoing, we find no cause to overturn the agency's action based on the challenged incidental take statement.

*2. The No-Jeopardy Conclusion is Not Arbitrary and Capricious*

Petitioners' overarching argument regarding the no-jeopardy conclusion depends on reading the Service's opinion as conclusory. In support of this reading, Petitioners maintain that the opinion fails to take account of (1) the Rio Grande project (*see supra* note 2); (2) the effects of other projects when developing the so-called environmental baseline and their aggregate impacts; and (3) the cumulative effects by not aggregating impacts and not considering factors used in the Rio Grande project's biological opinion. As explained below, we reject each of these arguments.

To start, under Section 7 of the ESA, once the Service concluded its formal consultation process with FERC regarding the project's effects on the endangered cats, the Service was required to issue a biological opinion, summarizing the information it is based on and discussing the project's anticipated effects on the cats, including whether the project is "likely to jeopardize the [cats'] continued existence." 50 C.F.R. § 402.14(g)(4). *See also id.* § 402.14(h)(iv). And this conclusion was reached after evaluating both the direct and indirect effects of an action on the cats. *See id.* § 402.02(d) (defining the action area); *see also Oceana, Inc. v. Pritzker*, 75 F. Supp. 3d 469, 486 (D.D.C. 2014) (explaining that the Service, as the "expert agency charged with administering the ESA, may reasonably conclude that a given agency action, although likely to reduce the likelihood of the species' survival and recovery to some degree, would not be likely to jeopardize the continued existence of the species").

First, the Service's decision to omit the Rio Grande project in its Annova jeopardy analysis was not arbitrary and capricious because the Rio Grande project location was outside of the Annova project's action area.[7] The Annova project's action area does not include lands north of the Brownsville Ship Channel. Although Petitioners suggest in their reply brief that the Service drew the "'action area' boundary to exclude Rio Grande, even though Rio Grande is adjacent to Annova by only .3 miles on the opposite side of the Brownsville Ship Channel," we are unpersuaded. Indeed, the Service has supported its rationale for drawing the action area boundary as it did, noting, among other reasons, that all activity that will disturb the land as well as all vehicle traffic will occur *south* of the Brownsville Ship Channel. The Service's decision regarding the action area is thus entitled to deference. *See Medina Cnty.*, 602 F.3d at 699.

Further, though FERC considered the Rio Grande project in its description of the *marine* action area, this consideration was confined to FERC's analysis of vessel traffic on marine species, which is not part of the Service's consideration and not the subject of this challenge. It should also be noted that when FERC defined the non-marine action area, lands north of the Brownsville Ship Channel were similarly excluded. To the extent that Petitioners attempt to expand the action area based on where the cats roam as opposed to where the project's direct or indirect effects will occur, this position is misguided. *See Oceana, Inc. v. Evans*, 384 F. Supp. 2d 203, 228–29 (D.D.C. 2005) (rejecting this position in the case of alleged threats to loggerhead turtles, upholding the agency's definition of the action area as

---

[7] The "action area" is defined as "all areas to be affected directly or indirectly by the Federal action and not merely the immediate area involved in the action." 50 C.F.R. § 402.02; *see Nat'l Family Farm Coal v. EPA*, 966 F.3d 893, 927 (9th Cir. 2020) ("We accord deference to [the agency] in the way it chose to define the action area.")

where the fishery operates, and maintaining that there is "no support for the proposition that the action area must be extended to include the migratory range of loggerhead turtles").

Petitioners' argument that the Rio Grande project site should be included in the action area lest the Annova action area be too narrowly defined is equally unavailing. Although courts have previously found action areas to be too narrowly defined where they were limited to, for example, lands only within the agency's control, *see Defs. of Wildlife v. Babbitt*, 130 F. Supp. 2d 121, 128–29 (D.D.C. 2001), such is hardly the case here. Indeed, the Service included private lands, public lands, roads, water lines, and agricultural lands.

Second, the Service's environmental baseline does not render its no-jeopardy conclusion arbitrary and capricious. Under the ESA's regulations, the Service is required to evaluate the "effects of the action" against an environmental baseline, which includes "the past and present impacts of all Federal, State, or private actions and other human activities in the action area." 50 C.F.R. §§ 402.02, 402.14(g)(2). Here, the Service described and discussed the relevant ecosystems within the Rio Grande Delta region, the other federal actions in the area, the status of the cats and their habitat as well as what affects the cats' habitat. For example, the opinion discusses nine other federal actions that "have resulted in formal section 7 consultations with the Service and the issuance of incidental take for the ocelot and jaguarundi within the Action Area." These actions involved widening and improving highways, installing a waterline, and issuing launch licenses for orbital or suborbital vehicles, among others. The Service discussed the authorized take for these actions and explained that if all of the authorized takes occurred, then the ocelot population relevant to this petition would be "extirpated." But the Service went on to explain that to its knowledge, "no

cats have been taken from any of the [discussed] projects."[8] *See id.* § 402.02 (explaining that the Service is required to consider the "past and present impacts" of federal actions in the area). We note, too, that a take is not necessarily lethal but rather includes actions that could "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or attempt to engage in any such conduct." 16 U.S.C. § 1532(19). Indeed, in many of the discussed projects, lethal takes were not authorized.

Finally, there is no requirement that the Service provide a specific numerical analysis in lieu of a qualitative analysis regarding the effects of the projects on the species. *See* Interagency Cooperation—Endangered Species Act of 1973, 51 Fed. Reg. 19,926, 19,932 (June 3, 1986) (codified at 50 C.F.R. pt. 402) (discussing that the agency should address "the totality of factors affecting the species"); *see also Gifford Pinchot Task Force v. U.S. Fish & Wildlife Serv.*, 378 F.3d 1059, 1067 (9th Cir. 2004) (explaining that "the ESA does not prescribe how the jeopardy prong is to be determined"), *superseded on other grounds by* Definition of Destruction or Adverse Modification of Critical Habitat, 81 Fed. Reg. 7214 (Feb. 11, 2016); *Mayo v. Jarvis*, 177 F. Supp. 3d 91, 138 (D.D.C. 2016) (noting that "nothing in the statute or regulation[s] requires the [Service] to rigidly add up each incidental take").

Based on this review, and the fact that the ESA does not define how to measure whether an action will in fact "jeopardize the continued existence" of the cats, the Service could make this determination based on its own expertise. *See State Farm*, 463 U.S. at 43; *see also Pritzker*, 75 F. Supp. 3d at 486–87. And such determination provides us no occasion to overturn the agency's conclusions.

---

[8] Further, as the Service points out in its brief, some of the projects are now completed and the authorized take has since expired.

Third, the Service's cumulative effects analysis does not render the Service's determinations arbitrary and capricious. "Cumulative effects" are defined as "those effects of future State or private activities, not involving Federal activities, that are reasonably certain to occur within the action area of the Federal action subject to consultation." 50 C.F.R. § 402.02(d). In formulating a biological opinion, the Service must determine whether the action, taken together with "cumulative effects to the environmental baseline and in light of the status of the species . . . is likely to jeopardize the continued existence of listed species." *Id.* § 402.14(g)(4).

Although courts have found that a cumulative effects analysis was deficient where there was "no analysis whatsoever," *see Greenpeace v. Nat'l Marine Fisheries Serv.*, 80 F. Supp. 2d 1137, 1149 (W.D. Wash. 2000), this is not the case here. The Service's effects analysis accounted for the effects of each project against the baseline and the cats' survival and recovery. Indeed, the Service provided a detailed analysis of direct effects of the project on the ocelot and jaguarundi such as habitat loss, human disturbance, operational noise, vehicle collisions, and light emissions. For example, human disturbance could cause the ocelot to flee or change habitat selection, and a new access road could increase the risk of a vehicle collision with an ocelot, But in response to these concerns, Annova agreed to take certain actions to mitigate the risk. Regarding the risk of vehicle collisions, for instance, Annova agreed to mandate a 25 miles per hour speed limit. From there, the Service then concluded that the project "may harm or harass" an ocelot and "prevent[] dispersal of cats into otherwise suitable habitat," but that this anticipated take would not likely jeopardize the cats "in the wild across their range."

To be sure, the regulations neither preclude all actions that will result in the take of an endangered species nor require a finding that the species will be jeopardized if there is a likelihood of a take. *See* 50 C.F.R. §§ 402.13(a),

402.14(b)(1) (discussing the type of consultation required and the Service's responsibilities but not requiring the Service to preclude actions that will harm an endangered species); *see also* 16 U.S.C. § 1536(b)(4).

Further still, the Service considered the effects of a natural gas interconnection, overhead transmission lines, an underground water supply, wind energy projects, other oil and gas projects, and urban development. That the factors considered in the Rio Grande cumulative effects analysis are not identical to those considered here does not render the no-jeopardy conclusion arbitrary and capricious. To be sure, the Rio Grande materials are not part of the record in this case. And we note at that we "may not consider evidence outside of the administrative record." *Harris v. United States*, 19 F.3d 1090, 1096 n.7 (5th Cir. 1995).

Petitioners also challenge the opinion's mitigation measures, namely the conservation of acreage, as arbitrary and capricious. This argument amounts to speculation about further explanation that the Service *could* have provided regarding why the habitat loss at the project site will not jeopardize the endangered cats and how the conserved acreage will offset the acres disturbed by the project. But Petitioners point to no portion of the ESA that would have required the Service to add such explanation and write the opinion any differently. Here, the Service biologists worked for five years with FERC and Annova before issuing the opinion and concluding that the loss of the 212 acres—offset by habitat acreage and other conservation measures—will not jeopardize the cats' continued existence. And this is precisely the type of conclusion that is entitled to deference. *Medina Cnty.*, 602 F.3d at 699.

At bottom, the Service considered all that it was required to consider—and much of what Petitioners argue they failed to consider—except for what it was specifically allowed to omit.

No. 20-60319

Plainly put, the Service has identified the reasons underlying its conclusion that the ocelot and jaguarundi's continued existence would not be jeopardized by the project, and it has articulated a rational connection between these reasons and that conclusion. This is all that the ESA and its implementing regulations require. *See Luminant Generation Co. LLC v. EPA*, 714 F.3d 841, 850 (5th Cir. 2013); *see also Atchafalaya Basinkeeper v. U.S. Army Corps of Eng'rs*, 894 F.3d 692, 697 (5th Cir. 2018).

Therefore, the Service's biological opinion was not arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law.

**IV.**

For the foregoing reasons, we DENY the petition.