**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

United States Court of Appeals
Fifth Circuit

**FILED**

July 6, 2018

Lyle W. Cayce
Clerk

No. 18-30257

———————

ATCHAFALAYA BASINKEEPER; LOUISIANA CRAWFISH PRODUCERS
ASSOCIATION-WEST; GULF RESTORATION NETWORK;
WATERKEEPER ALLIANCE; SIERRA CLUB, and its Delta Chapter,

> Plaintiffs - Appellees

v.

UNITED STATES ARMY CORPS OF ENGINEERS,

> Defendant - Appellant

BAYOU BRIDGE PIPELINE, L.L.C.; STUPP BROTHERS,
INCORPORATED, doing business as Stupp Corporation,

> Intervenor Defendants - Appellants

———————

Appeals from the United States District Court
for the Middle District of Louisiana

———————

Before REAVLEY, JONES, and GRAVES, Circuit Judges.

EDITH H. JONES, Circuit Judge:

The United States Army Corps of Engineers (the "Corps") and Bayou
Bridge Pipeline, LLC ("Bayou Bridge," a convenience that includes co-
appellant Stupp Brothers, Inc.), appeal the district court's grant of a
preliminary injunction preventing Bayou Bridge from constructing a pipeline

No. 18-30257

in part through the Atchafalaya Basin of southern Louisiana.  The injunction was based on the Corps' alleged failure to satisfy the demands of the National Environmental Policy Act in issuing a construction permit.  Because the court misperceived the applicable regulations, and the Corps' analysis, properly understood, vindicates its decision that an Environmental Assessment sufficed under these circumstances, we vacate the preliminary injunction and remand to the district court.

## BACKGROUND

On December 14, 2017, after a year-long review, the Corps issued Bayou Bridge a permit under Section 404 of the Clean Water Act ("CWA"), 33 U.S.C. § 1344, and Sections 10 and 14 of the Rivers and Harbors Act of 1899, 33 U.S.C. §§ 403, 408, allowing it to build a 162-mile crude oil pipeline from Lake Charles, Louisiana to terminals near St. James.  Portions of the pipeline will cross the Atchafalaya Basin, affecting wetlands.  The discharge of dredge or fill material into these wetlands necessitated the Corps' permitting action under the Clean Water Act, 33 U.S.C. § 1311(a), while the Rivers and Harbors Act requires permitting for structures in or affecting "navigable waters" as defined by regulations.

In discharging its permit responsibilities, the Corps was required to implement the National Environmental Policy Act ("NEPA"), a procedural statute, which requires certain steps before federal agencies may approve projects that will affect the environment.  To comply, the agency first prepares an environmental assessment ("EA").  *Sabine River Auth. v. U.S. Dep't of Interior*, 951 F.2d 669, 677 (5th Cir. 1992).  As this court has held, "[a]n EA should be a 'concise public document . . . that serves to . . . [b]riefly provide sufficient evidence and analysis for determining whether to prepare an [environmental impact statement].'" *O'Reilly v. U.S. Army Corps of Eng'rs*, 477 F.3d 225, 228 (5th Cir. 2007) (quoting 40 C.F.R. § 1508.9(a)).  If the agency

finds during this process that the proposed action will result in "significant" effects to the environment, then it must also prepare an environmental impact statement ("EIS"). *Id.*; 42 U.S.C. § 4332(C). If the agency finds that the project will not have a significant impact, it will conclude with a "Finding of No Significant Impact" ("FONSI") and no EIS will be required. *Sabine River Auth.*, 951 F.2d at 677.

In this instance, the Corps authored two EAs, one under the Rivers and Harbors Act (the "408 EA"), and the other under Section 404 of the CWA (the "404 EA"). Based on those assessments, which together run over two hundred pages, plus appendices of nearly 200 pages more, the Corps determined that an EIS would not be necessary for this project and issued a FONSI.

Atchafalaya Basinkeeper and other organizations interested in the Atchafalaya basin brought suit in January 2018 against the Corps and sought a preliminary injunction to redress alleged violations of NEPA and the CWA. Bayou Bridge and Stupp Brothers intervened as defendants. The district court held an expedited hearing even before the complete administrative record could be filed. The court's decision, filed soon afterward, rejected a number of Appellees' contentions but found that Appellees had shown irreparable harm and had demonstrated a likelihood of success on the merits as well as other prerequisites of preliminary relief for two of their claims: (1) the EAs violated NEPA and the CWA by failing to adequately analyze mitigation for the loss of cypress-tupelo swamp along the pipeline right of way through the Basin, and (2) the EAs violated NEPA and the CWA by failing to adequately consider historical noncompliance by other pipelines and the cumulative effects of this project. The resulting preliminary injunction stopped construction only "within the Atchafalaya Basin."

Appellants sought a stay of the injunction pending appeal, which this court granted in a split decision.

No. 18-30257

Appellants raise a number of issues for review: that the district court applied an incorrect standard for determining injunctive relief; abused its discretion in finding Appellees likely to succeed on the merits and affirming the other bases for injunctive relief; and issued an improper and overbroad injunction. We need only rule on the court's errors in assessing the likelihood that Appellees will succeed on the merits.[1]

## STANDARD OF REVIEW

A grant of a preliminary injunction is reviewed for abuse of discretion. *La Union Del Pueblo Entero v. FEMA*, 608 F.3d 217, 220 (5th Cir. 2010). Factual determinations within the preliminary injunction analysis are reviewed for clear error, and legal conclusions within the analysis are reviewed de novo. *Id.* A preliminary injunction is an extraordinary remedy. In addition to proving a likelihood of prevailing on the merits, the movant must demonstrate a substantial threat of irreparable injury if the injunction is not granted; the threatened injury outweighs any harm that will result to the non-movant if the injunction is granted; and the injunction will not disserve the public interest." *Id.* at 219. The district court abuses its discretion if it relies on clearly erroneous factual findings in deciding whether to grant a preliminary injunction or relies on "erroneous conclusions of law." *O'Reilly*, 477 F.3d at 238 (internal citations and quotations omitted).

---

[1] In particular, the parties spar over whether the Supreme Court has determined that a "substantial likelihood of success on the merits" is invariably required for injunctive relief, thereby overruling some decisions that implied a "sliding scale" comparing the legal issues with the strength of the "irreparable harm" to the non-movant. *Compare Winter v. Nat. Res. Def. Counsel, Inc.*, 555 U.S. 7, 129 S. Ct. 365, (2008) *with Productos Carnic, S.A. v. Cent. Am. Beef & Seafood Trading Co.*, 621 F.2d 683, 686 (5th Cir. 1980)). Although the district court here first applied the sliding scale approach, it alternatively referenced the substantial likelihood of success requirement. Additionally, because the court's legal errors here, though no doubt inadvertent, are decisive, we need not wade into that debate.

No. 18-30257

The Corps' actions under the NEPA and CWA are subject to review under the Administrative Procedure Act ("APA").  As relevant here, a court will uphold an agency action unless it finds it to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A); *Coastal Conservation Assoc. v. U.S. Dep't of Commerce*, 846 F.3d 99, 110-11 (5th Cir. 2017).  This is a demanding standard.  The Supreme Court carefully explained factors that inform judicial review under this provision.  *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43, 103 S. Ct. 2856, 2866-67 (1983), and its words are worth repeating here:

> The scope of review under the "arbitrary and capricious" standard is narrow and a court is not to substitute its judgment for that of the agency. Nevertheless, the agency must examine the relevant data and articulate a satisfactory explanation for its action including a "rational connection between the facts found and the choice made." In reviewing that explanation, we must "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

 (citations omitted).

## DISCUSSION

A.  The district court decision.

The district court analyzed at length each of the Appellees' specific challenges to the procedural and substantive sufficiency of the EAs.  The court rejected the complaint that the Corps' analysis of the environmental impact on the Basin of possible oil spills was insufficient and therefore arbitrary and capricious.  The court also rejected the assertion that the Corps provided

5

defective public notice of the "type and location of the proposed mitigation" measures; as the court noted, the public comments, many of which were made by the Appellees here, were addressed and responded to by the Corps in 26 pages of the Section 404 EA.

The court then focused on specific impacts of this project in the Basin, i.e., that 455.5 acres of "jurisdictional wetlands" will be temporarily affected and approximately 142 acres of those wetlands "[will] be permanently converted from forested to herbaceous wetlands within the permanent right-of-way." The Section 404 EA states that "[t]he proposed project will change and/or reduce wetland functional quality along the proposed ROW by conversion of forested habitat types." The EA identifies "[a] key issue(s) of concern in this watershed is the loss of wetland function and value."

The court found three failures in the Corps' ultimate FONSI determination. First, the court acknowledged that "reliance on mitigation measures may reduce a project's impacts below the level of significance," quoting *O'Reilly*, 477 F.3d at 231, and the agency's reasoning "need not be laid out to the finest detail . . . ." However, "an EIS involving mitigation" may not be predicated on "mere perfunctory or conclusory language . . . ," quoting *O'Reilly*, 477 F.3d at 231-32. The court believed the Corps was perfunctory.

Second, the court accepted the Appellees' reading of the relevant CWA regulation, 33 C.F.R. §332.3, and concluded it does not "impos[e] a mechanical and rigid hierarchy" according to which out-of-kind mitigation credits within the watershed must be substituted for alternative in-kind mitigation alternatives. The court accordingly criticized the Corps' EAs for failing to discuss "how the mitigation choices serve[] the stated goal of 'replac[ing] lost functions and services;'" and failing to analyze in the Section 404 EA whether a 'preference' for mitigation bank credits was appropriate or whether the particular mitigation bank credits to be acquired are "located where it is most

likely to successfully replace lost functions and services." (quoting 33 C.F.R. § 332.3(b)(1)). The court found the 404 EA "devoid" of data analyzing the consequence of the "irretrievabl[e] los[s]" of 142 acres of cypress/tupelo swamp wetlands. Consequently, "there is not one iota of discussion, analysis, or explanation" how out-of-kind credits mitigate the loss of function of the cypress/tupelo swamp. The court also found "precious little analysis" of what "best practices" the Corps required for Bayou Bridge's construction will be and how they offset temporary impacts of construction within the Basin. For these basic reasons, the court determined that the FONSI for this project was arbitrary and capricious.

Third, the court also discussed Appellees' contention that because earlier pipeline projects through the Basin had created spoil banks and other detrimental conditions, the EAs did not properly address "cumulative impacts" of this project in terms of those defaults. The court agreed with Appellees' contention, referring to *O'Reilly*, 477 F.3d at 234-35, and 40 C.F.R. §§ 1508.7 and 1508.25. It concluded that Appellees had demonstrated a likelihood of success on the merits in showing the deficiency of the EAs.

Bearing in mind that the Corps' NEPA obligation was limited to discussing relevant factors and explaining its decision, not to reaching conclusions that this court or the district court approves, *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350, 109 S. Ct. 1835, 1846 (1989), we address each of these conclusions in turn.

B. FONSI versus "mitigated FONSI."

In its critical reliance on *O'Reilly*, the court misunderstood the difference between a "mitigated FONSI" at issue in that case and the Corps' FONSI here. The "mitigated FONSI" means that without mitigation, a project will have a "significant" environmental impact. Final Guidance for Federal Departments and Agencies on the Appropriate Use of Mitigation and Monitoring and

No. 18-30257

Clarifying the Appropriate Use of Mitigated Findings of No Significant Impact, 76 Fed. Reg. 3843, 3846 (Jan. 21, 2011). Here, however, after considering all the circumstances, including—importantly—measures imposed on Bayou Bridge to comply with the CWA, this project did not have a "significant" environmental impact.

In *O'Reilly*, by contrast, the impact of a housing development on adjacent wetlands was undisputable and irrevocable, yet the Corps utterly failed to discuss mitigation measures. *O'Reilly*, 477 F.3d at 232-34.[2] On their face, the 200+ pages in both EAs here acknowledged potential environmental impacts from the project, discussed third parties' concerns about those impacts, referenced in detail the hydrological, horticultural and wildlife environment in the affected acreage of the Basin, and explained how and where mitigation bank credits and construction protocols would be adopted to render the watershed impact not "significant." The court's misplaced view that the Corps issued a "mitigated FONSI" is an error of law that steered it in the wrong direction. Perhaps the Corps' discussion might have been improved with the addition of certain details, but the Corps' path could "reasonably be discerned" from the EAs and other publicly available documents and should have been upheld. *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 US 644, 658, 127 S. Ct. 2518, 2530 (2007) (internal quotation marks omitted).

C.  Application of out-of-kind mitigation credits.

Separate from the "mitigated FONSI" issue is the question whether the Corps properly applied CWA regulations when it determined that Bayou Bridge could (1) utilize approved construction methods within the Basin, and

---

[2] The Corps additionally points out that *O'Reilly* predates Council on Environmental Quality Regulations that constituted final guidance and clarifications about, inter alia, the appropriate use of mitigated FONSIs. 76 Fed. Reg. at 3843. Appellees have not directly challenged the Corps' adherence to this guidance.

(2) purchase (a) in-kind mitigation credits, i.e. cypress-tupelo acreage within the watershed and, when those were exhausted, (b) out-of-kind credits of bottomland hardwood acreage within the watershed to compensate for the project's impact.

When it concluded that the Corps did not sufficiently explain the need for or alternatives to out-of-kind mitigation credits, or the measures required to replace "lost aquatic functions and services" from this project, the district court misread the applicable regulation and failed to acknowledge its application by means of the Louisiana Wetland Rapid Assessment Method ("LRAM").[3]  To explain these errors, we begin with the applicable CWA regulation, pursuant to which the Corps must require "compensatory mitigation" to "offset environmental losses resulting from unavoidable impacts to waters of the Unites States . . . ."  33 C.F.R. § 332.3(a)(1).  Mitigation is required to compensate "for the aquatic resource functions that will be lost as a result of the permitted activity."  *Id.*  Criticizing the Corps' approval of out-of-kind mitigation, the district court stated that Section 332.3 does not "impos[e] a mechanical and rigid hierarchy" establishing a preference for out-of-kind mitigation.  This was incorrect.

The first paragraph of the regulation states that, "in many cases, the environmentally preferable compensatory mitigation may be provided *through mitigation banks* or in-lieu fee programs because they usually involve consolidating compensatory mitigation projects where ecologically appropriate, consolidating resources, providing financial planning and

---

[3] The court also clearly erred in stating that, "142 acres of wetlands . . . will be . . . irretrievably lost."  According to the 404 EA, 142 acres will be converted from forested wetlands to scrub shrub wetlands and 78 of these acres will have previously been cypress/tupelo swamp (designated PFO2 in the LRAM tables).  "Herbaceous wetlands" also provide important aquatic functions.  Because there will be no filling of wetlands in this project, converting them to dry land, the Corps found no permanent loss of wetlands.

scientific expertise (which often is not practical for permittee-responsible compensatory mitigation projects), reducing temporal losses of functions, and reducing uncertainty over project success." § 332.3(a)(1) (emphasis added).

The next section of the regulation, describing "Type and location of compensatory mitigation," states that "[w]hen considering options for successfully providing the required compensatory mitigation, the district engineer *shall consider* the type and locations options *in the order presented in paragraphs (b)(2) through (b)(6) of this section.* In general, the required compensatory mitigation should be located within the same watershed as the impact site . . . ." § 332.3(b)(1) (emphasis added). The first listed option is "Mitigation bank credits," which then describes the reasons "the district engineer should give preference" to them;  the reasons include the better scientific management, large scale, and financial security provided within mitigation banks. § 332.3(b)(2). Further, mitigation bank credits are preferred "[w]hen permitted impacts are located within the service area of an approved mitigation bank, and the bank has the appropriate number and resource type of credits available." *Id.*

The regulation next describes in detail the "Watershed approach to compensatory mitigation," § 332.3(c), among whose "Considerations" is that it "may include on-site compensatory mitigation, off-site compensatory mitigation (including mitigation banks or in-lieu fee programs), or a combination . . . ." § 332.3(c)(2)(iii). In regard to "Site selection," the regulation specifically authorizes district engineers to require "on-site, off-site, or a combination . . . [of] compensatory mitigation to replace permitted losses of aquatic resource functions and services." § 332.3(d)(2).

Once more, the regulation emphasizes that required "[m]itigation banks . . . may be used to compensate . . . in accordance with the *preference hierarchy in paragraph (b) of this section."* § 332.3(g).

10

If this language does not set up a plain "hierarchy" strongly approving of mitigation banks—as opposed to the Appellants' proffered clean-up by Bayou Bridge of spoil banks created by other pipeline builders long ago—it is hard to know what would do.  See also Compensatory Mitigation for Losses of Aquatic Resources, 73 Fed. Reg. 19,594, 19,600, (April 10, 2008), referring to "hierarchy" in this regulation.

As for the district court's concern that the "hierarchy" would permit out-of-kind mitigation, i.e., allowing purchases of some bottomland hardwood credits within the Basin to mitigate the conversion of cypress/tupelo swamp to shrub scrub wetlands, the regulation says only this: "In general, in-kind mitigation is preferable to out-of-kind mitigation . . . .  Thus, except as provided in paragraph (e)(2) of this section the required compensatory mitigation shall be of a similar type to the affected aquatic resource." § 332.3(e)(1).  The critical exception then authorizes out-of-kind compensatory mitigation "[i]f the district engineer determines, using the watershed approach . . . that [it] will serve the aquatic resource needs of the watershed." § 332.3(e)(2).  Further, "[t]he basis for authorization of out-of-kind compensatory mitigation must be documented in the administrative record for the permit action." *Id.*

In sum, the Corps was authorized to employ out-of-kind credits *within the same watershed* if they *serve the aquatic resource needs of the watershed* and if the Corps' reasoning is *documented in the administrative record.* § 332.3(e)(1), (2).  That the out-of-kind credits here were within the watershed is not disputed.  What is questioned is whether the Corps sufficiently documented how those credits serve the Basin's aquatic resource needs.

No doubt in part because the Appellees did not highlight the Corps' use of the LRAM methodology, the district court was not attuned to the agency's reasoning about out-of-kind credits.  However, because that methodology is of

11

public record, and because its use forms a major portion of the 404 EA, we can review the Corps' decision within the proper administrative framework.

The LRAM is the type of "functional assessment" tool that the CWA regulation advises "should be used" to "determine how much compensatory mitigation is required." § 332.3(f)(1).  Although LRAM is not a formal agency rule, it was published, subjected to comment by the public and numerous federal and Louisiana state agencies, and revised following their input.  The LRAM states that its purpose is to "quantif[y] adverse impacts associated with permit applications and environmental benefits associated with compensatory mitigation" to determine the amount and type of credits necessary to offset a given impact.  The LRAM consists of nearly 50 pages addressing all types of wetlands found in Louisiana, including bald cypress/tupelo swamp and bottomland hardwoods.  It uses the prescribed "watershed approach," and it assigns a numerical value to wetlands that will be affected by a Corps permit. The value scores the "lost aquatic functions and services" and the acreage affected by the permit, and it identifies mitigation banks in the same watershed where credits can be purchased to offset any loss.  Using scientific data and numerous references, the LRAM scores wetlands impact based on factors including (1) the number of acres affected by the prospective permitted project;  (2) how difficult particular wetlands are to replace;  (3) habitat condition;  (4) hydrologic condition;  (5) negative human influences;  and (6) permanent, partial or temporary loss.  The LRAM assigns values to the quality of the wetlands and of the mitigation banks, converts the values into credits, and determines on a watershed basis how many acres in mitigation banks must be purchased by the prospective permittee.

In general, the Supreme Court has held that the use of scientific methodology like that contained in the LRAM is subject to particular judicial deference.  *Marsh v. Oregon Nat. Res. Council*, 490 U.S. 360, 377-78,

109 S. Ct. 1851, 1861 (1989). More specifically, the Sixth Circuit has held that the use of "structural proxies that rationally predict aquatic functionality" "requires the exercise of complex scientific judgment and deference to the Corps' expertise." *Kentuckians for the Commonwealth v. U.S. Army Corps of Eng'rs*, 746 F.3d 698, 713 (6th Cir. 2014). Not to defer to the LRAM would be an error by this court.

How the LRAM was utilized in the instant 404 EA is clearly referenced, if not fully explained in background, in twelve pages. Each of the eight watersheds crossed by this project is individually described, followed by a summary description of the mitigation bank credits required for each, followed by a summary chart for each watershed. Notably, although Appellees challenge only the requirement for out-of-kind mitigation bank purchases in the Atchafalaya Basin, they do not complain about similar out-of-kind credits that were also applied to the Terrebonne watershed.

That the LRAM analysis "rational[ly] connect[ed]" the out-of-kind mitigation bank purchases in the Basin to the "aquatic functions and services" lost by the project is all that was required either by the CWA regulation, by NEPA, or by the Supreme Court. *Motor Vehicle Mfrs.*, 463 U.S. at 43, 103 S. Ct. at 2866-67.

First, Bayou Bridge was required to buy bottomland hardwood credits within the Basin watershed only because it had already purchased all available cypress/tupelo swamp credits. The Corps was entitled to make this decision rather than revert to the less-preferred alternatives prescribed in the regulations.

Second, the Corps' responsibility under the CWA is to ensure the protection of aquatic functions and services, which does not include the protection of tree species as such. The LRAM, properly read and understood, measures and scales precisely the aquatic functions and services characteristic

of each type of Louisiana wetland and corresponding mitigation banks containing those wetlands. The scales differed for bottomland hardwoods and cypress/tupelo swamp on the basis of factors noted above. Appellees have not challenged the scientific validity of the LRAM-based analysis and calculations.

Third, as the 404 EA clearly states, "[t]he Louisiana Wetland Rapid Assessment Method was utilized to determine the acquisition of a total of 714.5 acres of suitable habitat credits, from approved mitigation banks within the watershed of impact." It was on the basis of the LRAM that the Corps determined how many acres Bayou Bridge was required to purchase from mitigation banks within the Basin. Whether bottomland hardwoods or cypress/tupelo, both mitigation banks constitute wetlands, and the Corps concluded that the required purchases made up for the temporary or permanent conversion from one type of wetland (bottomland hardwood or cypress/tupelo swamp) to scrub shrub wetland. And as has been mentioned, Appellees did not contest the out-of-kind mitigation used in part to compensate for wetland conversion in the Terrebonne watershed.

Fourth, citing Section 332.3(b)(2)-(6), the 404 EA's discussion of required compensatory mitigation bank purchases notes that the Corps' conclusion accords with "the preferred hierarchy as set forth by the USACE," i.e. in-basin, in-kind mitigation first; in-basin, out-of-kind second; etc.

Fifth, contrary to the district court's skepticism about the Corps' requirement of Best Management Practices during construction, the 404 EA concludes its analysis with the following description of "Other Mitigative Actions":

> (See Department of the Army permit Special Conditions.) The applicant has avoided and minimized impacts to wetlands through co-locating the proposed project with other utility ROW's, the use of horizontal directional drills, restrictions in construction ROW width in wetlands [from 100' to 75'], and restrictions in the width

14

of permanently maintained ROW in wetlands [from 30' to 15']. These avoidance and minimization measures will result in avoided wetland impacts.

In addition to the foregoing measures, the 404 permit requires Bayou Bridge to "re-establis[h] pre-existing wetland contours and conditions immediately following project completion." The 404 EA also states that Bayou Bridge agreed to place its pipeline at a sufficient depth not to impede future spoil bank removal projects (from previous construction). Another permit condition warns that modification or adjustments to the pipeline as built may be required "to facilitate any future . . . hydrologic restoration projects." The project's permit may be modified or even revoked if Bayou Bridge fails to produce photographic evidence of compliance with the permit conditions.

Sixth, to the extent *O'Reilly* might be considered to require the Corps to discuss mitigation alternatives under NEPA (irrespective of the distinction between a FONSI and a "mitigated FONSI"), that case becomes readily distinguishable when viewed in light of these EAs. *O'Reilly* predated and thus did not involve the mitigation hierarchy and considerations set forth in 33 U.S.C. § 332.3. As Bayou Bridge points out, *O'Reilly* did not involve mitigation banks approved under Section 332.8, nor an LRAM-type functional assessment tool. This court's decision rested on the fact that the Corps supplied "only cursory detail as to what" mitigation measures were required or how they operated. *O'Reilly*, 477 F.3d at 234. In evaluating this project, the Corps conducted careful research; hewed to the governing regulations and the scientifically based LRAM tool; conditioned the permit in accordance with evolved best management practices; required purchases of acreage within mitigation banks that will provide the optimal replacement of lost aquatic functions and services; and produced two significantly reasoned EAs.

Finally, this explanation of the Corps' decision process is readily understood on the basis of the EAs, supplemented by the publicly available LRAM. That the district court's opinion did not express this understanding no doubt is partly attributable to its expedited judicial process, which pressed the parties' presentations and lacked the full administrative record. But regardless of these difficulties, the record suffices to supply a "rational connection" between the facts about the project and its CWA implications and the ultimate decision rendered. The Corps' decision was thus not "arbitrary and capricious."

D.  Analysis of "cumulative impacts"

The district court asserted that the Corps "myopically" considered this project's impacts alone, and it found the EAs deficient for failing to evaluate the pipeline project's impact cumulatively with the effect of spoil banks left from past projects and an alleged history of noncompliance with prior Corps-approved permits. These criticisms misread the applicable statute and the EAs. Under NEPA, agencies must consider each "cumulative impact" of permitted actions, and that term is defined as "the impact on the environment which results from the *incremental impact* of the action when added to other past, present, and reasonably foreseeable future actions." 40 C.F.R. § 1508.7 (emphasis added). Here, the EAs concluded that because of appropriate mitigation measures, in terms of construction conditions and limitations in the permit, and Bayou Bridge's purchase of compensatory mitigation bank acreage, there would be *no incremental impact*; hence, there could be no cumulative effects with regard to pre-existing spoil banks.

The 408 EA specifically acknowledged past, present and reasonably foreseeable future actions, including previous pipelines, and maintained its conclusion that there would be no adverse results from  temporary discharges during this construction. The 404 EA states that the district commander

reviewed the 408 EA before coming to a finding of no significant impact.  The 404 EA does discuss cumulative effects on the environment.  It concluded that "through the efforts taken to avoid and minimize effects . . . and the mandatory implementation of a mitigation plan . . . permit issuance will not result in substantial direct, secondary or cumulative adverse impact on the aquatic environment."

Although the district court focused on the potential of the project for wetland alteration or loss, the EA states: "Resulting natural resource challenges and stresses include permanent loss of wetlands (*of which this project constitutes temporary or conversion impacts, not permanent wetland loss),* loss of wildlife habitat, and impacts to water quality.  A key issue(s) of concern in this watershed is loss of wetland function and value." (emphasis added).  Not only does this clearly signify no permanent wetland loss, but also, after explaining mitigation for temporary impacts, monitoring and mitigation bank purchases in accord with LRAM, the EA states:  "Appropriate compensatory mitigation was purchased at these banks to *offset unavoidable impacts to wetlands that would result from permit issuance.*"  (emphasis added).  Finally, to recapitulate the permit conditions mentioned previously, Bayou Bridge's construction, according to the permit, will leave the smallest possible footprint and will in several ways be accomplished without hindering possible future efforts to remove old spoil banks left by prior construction.  In addition, the Corps is authorized under the permit to require replanting of desirable native tree species and undertake additional compensatory mitigation, further remediation actions, and/or further monitoring if the initial mitigation proves inadequate.

The Corps' analysis is not "myopic" with respect to "cumulative impacts" from other projects in the past.  Our sister circuit has held that a finding of no incremental impact relieves an agency of the necessity of extensive and

ultimately uninformative discussion of cumulative effects pursuant to this regulation. *See Nw. Envtl. Advocates v. Nat'l Marine Fisheries Serv.*, 460 F.3d 1125, 1140-41 (9th Cir. 2006); *Northern Plains Res. Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067, 1082 (9th Cir. 2011); *cf. Louisiana Crawfish Producers Ass'n-West v. Rowan,* 463 F.3d 352, 359 (5th Cir. 2006) ("The fact that the area is suffering environmental losses is part of the past cumulative impacts study *but is not relevant to a finding of future impacts flowing from the project"*) (emphasis added). The Corps acknowledged extrinsic past impacts on the Basin and explained how this permit will not only remediate the impacts of this project but will not interfere with further efforts to restore the watershed.

The court's concern about cumulative effects based on the alleged past noncompliance with Corps permit conditions is also misplaced. Not only did some of those projects predate the Clean Water Act, but Appellants' factual information undermines specific charges made by Appellees about certain permit holders. And in any event, the court's fear of insufficient Corps monitoring activity contravenes "the presumption that public officers discharge[] their duties according to law." *Chaney v. United States*, 406 F.2d 809, 813 (5th Cir. 1969). The treatment of "cumulative impacts" by the EAs was not deficient, much less arbitrary and capricious.

## CONCLUSION

For the foregoing reasons, the EAs concerning this permit do not exhibit the Supreme Court's criteria for an "arbitrary and capricious" decision. The agency decision did not "rel[y] on factors which Congress has not intended it to consider, entirely fail[] to consider an important aspect of the problem, offer[] an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n,* 463 U.S. at 43,

103 S. Ct. at 2867.  Further, because the court misapplied applicable legal principles and inadvertently but critically overlooked the LRAM, its decision was an abuse of discretion.  The preliminary injunction is **VACATED** and **REMANDED** for further proceedings.

No. 18-30257

REAVLEY, Circuit Judge, dissenting:

We have the law. To compensate for the destruction of environmentally protected wetlands, a permit must identify acreage apart that will protect the environment and compensate for what is destroyed. The administrative record must demonstrate how that decision was made, such that we uphold the decision not for its correctness but for its rational support.

The district judge carefully studied the justification here and saw that gaps exist without more than conclusions. Now, the circuit court skips over those gaps. I dissent and explain myself in two respects.

## A.    Out-of-Kind Mitigation and the Clean Water Act

The pipeline project will clear 262 acres of wetlands in the Atchafalaya Basin. That process will impact two resource types: cypress-tupelo swamp and bottomland-hardwood forest. In turn, the Corps applied its functional assessment tool (the Louisiana Rapid Assessment Method, or LRAM) and determined that the project's impact called for the purchase of 232.8 acres of cypress-tupelo swamp and 80 acres of bottomland-hardwood forest from mitigation banks. But in what the Corps labels an "unfortunate[]" turn of events, one of the chosen mitigation banks did not have the number of cypress-tupelo acres necessary to match a fully in-kind mitigation. So the Corps sanctioned instead the purchase of 69 cypress-tupelo acres and 243.8 bottomland-hardwood acres. In other words, the Corps offset cypress-tupelo harm with 69 in-kind cypress-tupelo acres and 163.8 out-of-kind bottomland-hardwood acres. The Corps thereby swapped each acre of unaccounted-for cypress tupelo with an acre of surplus bottomland hardwood—it treated the two resource types interchangeably.

Under the Clean Water Act and its corresponding regulations, before the Corps could order the above out-of-kind swap, it bore a duty to (1) determine

20

that such mitigation "will serve the aquatic resource needs of the watershed" and (2) so document that "basis for authorization . . . in the administrative record." 33 C.F.R. § 332.3(e)(2).

The court believes a satisfactory explanation lies in the Corps' LRAM tool. I disagree. The LRAM lacks a critical explanatory component and thereby leaves the Corps' out-of-kind mitigation unsubstantiated.

The court explains the LRAM's function as follows: "[T]he LRAM scores wetlands impact based on [various] factors . . . [and] assigns values to the quality of the wetlands and of the mitigation banks, converts the values into credits, and determines on a watershed basis how many acres in mitigation banks must be purchased by the prospective permittee." In elementary terms, the LRAM compares land to land (impact site to mitigation bank) and calculates a ratio that, when applied to impacted acres, produces a suggested quantity of mitigation acres.

However, the Corps still must accommodate another variable: resource *type*. The regulations prefer in-kind over out-of-kind mitigation precisely because different resource types supply different functions, or said another way, similar resource types are "most likely to compensate for the functions and services lost at the impact site." 33 C.F.R. § 332.3(e)(1). To that end, the LRAM identifies a laundry list of habitats and groups them into six resource categories: bottomland-hardwood forest, cypress-tupelo swamp, pine flatwoods-savanna, coastal prairie, fresh-intermediate marsh, and brackish-saline marsh. Each category encompasses habitats that either provide "similar wetland functions or naturally exist together as a community." The LRAM then highlights the presumption that "in-kind habitat replacement" will "assure similar functions and services that are lost at an impact site are gained at a mitigation site." Thus, when the Corps applies

in-kind mitigation to the LRAM's calculated acreage, there is no need to manipulate the end product because the Corps' path is self-explanatory—the ecological functions intrinsic to both parcels and resource types are fully documented on both sides of the mitigation equation.

But when the Corps substitutes on the back end a resource that is out of kind—defined by the LRAM as "a resource of a different structural and functional type from the impacted resource"—the LRAM can no longer rely on a presumption of like functions for like resources. How, then, does the LRAM go about accounting for the variation between the resource impacted on the front end and the one purchased on the back end? The LRAM's ratio itself does not factor in the resource type purchased on the back end. So, lest we assume that the LRAM's calculated acreage is entirely fungible across *all* resource types—something no party or the court goes so far as to suggest—there must be something else in the LRAM to translate impacts from one resource to another (in this case, to justify the one-to-one substitution of bottomland hardwood for cypress tupelo).

In that crucial respect, the LRAM is conspicuously silent. It mentions "out of kind" a single time: to define the term. Nowhere does the LRAM explain how to quantify impacts to one resource in terms of another, much less how cypress tupelo and bottomland hardwood—habitats of a "different structural and functional type"—can swap seamlessly for each other in terms of the basin's resource needs. As useful as it otherwise may be, the LRAM is simply not a tool for out-of-kind mitigation.

Nor does the Corps' Section 404 Environmental Assessment bridge the explanatory gap. There the Corps grounded its out-of-kind swap on the bare fact that "there [were] not enough [in-kind] credits available for purchase in the basin." But lack of in-kind credits, standing alone, says nothing of the

22

"resource needs" of the basin—the principal consideration that must accompany any order of out-of-kind mitigation. 33 C.F.R. § 332.3(e)(2).

The Corps did not meet its regulatory burden to explain out-of-kind mitigation in this case. From the administrative record, then, the Corps' "path may [not] reasonably be discerned." *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 658 (2007) (internal quotation marks omitted). The district court was therefore correct to enjoin construction.

## B.      Mitigated Versus Ambiguous Findings of No Significant Impact

Whatever the ultimate merits of the plaintiffs' claim under the National Environmental Policy Act, we ought to at least apply the right standard. I disagree with the court's decision to adopt various tiers of scrutiny between those so-called "mitigated Findings of No Significant Impact" (FONSIs) and those other FONSIs in which mitigation plays a prominent but facially ambiguous role.

In *O'Reilly v. United States Army Corps of Engineers*, 477 F.3d 225 (5th Cir. 2007), we held insufficient an Environmental Assessment "that fail[ed] to articulate how the mitigation measures will render the adverse effects insignificant." *Id.* at 227. The Corps argues, however, that *O'Reilly*'s scrutiny applies only to mitigated FONSIs, those in which an agency engages in a two-part finding: (1) project impacts alone would be significant but (2) with mitigation, the impacts are reduced to insignificance. This case, the Corps says, does not involve a mitigated FONSI because the agency considered the project impacts and mitigation *all at once* before issuing a single finding of no significant impact. The Corps draws its labels for this distinction from a 2011 guidance document. *See* 76 Fed. Reg. 3843, 3847–48. And the court appears to accept the Corps' distinction wholesale.

But that distinction is all form with no substance. *O'Reilly* stands for a fundamental proposition: When mitigation is a necessary part of a FONSI, the agency bears a duty to explain why the mitigation will be effective. 477 F.3d at 231–32. Thus framed, there are but two types of FONSIs under *O'Reilly*: (1) those in which mitigation is an integral part of the insignificant outcome and (2) those in which the mitigation is ultimately gratuitous—that is, when the impacts would be insignificant even without mitigation. There is no third option.

Of course, the manner in which an agency arrives at its FONSI can make the role of mitigation apparent on the face of the administrative record. When the agency issues a formal mitigated FONSI, we know for sure that mitigation was an integral piece. But, as here, when the Environmental Assessment lumps project impacts and mitigation into a single consideration with no further explication, the record obscures whether the impacts would have been significant absent the mitigation. All the same, these facially ambiguous assessments can involve necessary mitigation. And that is more than common sense talking; the Corps' own guidance document tells us that ambiguous assessments might well involve mitigation that "reduce[s] the projected impacts of agency actions to below a threshold of significance." 76 Fed. Reg. 3843, 3847. In such a case, there is zero substantive difference between a mitigated FONSI and a facially ambiguous one and, as a consequence, zero reason to treat the two any different.

So, the question becomes, was mitigation necessary to this project's insignificant impact? On the one hand, the Corps is unwilling to concede that mitigation was necessary to reduce the project's impact to insignificance. This despite the pages and pages of the Environmental Assessment detailing the hundreds of acres of shredded wetlands and corresponding compensatory

mitigation. *See* 33 C.F.R. § 320.4(r)(1) (explaining that compensatory mitigation is meant to rectify "*significant* resource losses") (emphasis added). Nonetheless, that must necessarily mean the project's impacts would be insignificant even without mitigation. But as it so happens, the Corps is unwilling to say that either. And therein lies the paradox—the ambiguous record here enables the Corps to tiptoe on a nonexistent fence between the only two realities: mitigation that matters and mitigation that does not.

When an agency cloaks the importance of mitigation behind an ambiguous administrative record, I would hold the agency to the standard articulated in *O'Reilly*.

I respectfully dissent.