# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

March 10, 2021

Lyle W. Cayce
Clerk

No. 20-60299

Sierra Club; Defenders of Wildlife,

*Petitioners*,

*versus*

United States Department of Interior; Scott de la
Vega, *Acting Secretary*, *U.S. Department of the Interior*; United States
Fish and Wildlife Service, *an agency of the United States
Department of the Interior*; Aurelia Skipwith, *in her official capacity as
Director of the United States Fish and Wildlife Service*; Charles
Ardizzone, *in his official capacity as Field Supervisor, Texas Coastal
Ecological Services Field Office, Responsible Official*,

*Respondents*.

Petition for Review of an Order of
the United States Department of the Interior
Agency No. 20191002-5102

Before King, Elrod, and Willett, *Circuit Judges*.

King, *Circuit Judge*:

After years of review, the U.S. Fish & Wildlife Service issued a
biological opinion and incidental take statement in connection with the
construction and operation of a liquefied natural gas pipeline in south Texas.
Specifically, the U.S. Fish & Wildlife Service authorized the harm or

No. 20-60299

harassment of one ocelot or jaguarundi and determined that the project would not jeopardize the cats' continued existence. The Sierra Club and Defenders of Wildlife petition for review of the incidental take statement and biological opinion. For the reasons that follow, we DENY the petition.

**I.**

This challenge asks us to consider whether a decision by Respondent, the U.S. Fish & Wildlife Service (the "Service"), was arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law. Specifically, at issue is whether the Service complied with its obligations under the Endangered Species Act, 16 U.S.C. § 1531[1] *et seq.* (the "ESA"), in authorizing the harm or harassment of one ocelot or jaguarundi and in determining that the proposed project was not likely to jeopardize the continued existence of either cat.

By way of background, we discuss the proposed project, the cats, the relevant portions of the ESA and the federal regulations, and the agency action.

*1. The Project*

Intervenors Rio Grande LNG, LLC and Rio Bravo Pipeline Company, LLC (collectively, the "proponents") proposed a multi-billion-dollar project that is expected to provide a source of competitively priced liquefied natural

---

[1] In broad strokes, the ESA "seeks to protect species of animals against threats to their continuing existence caused by man." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 558 (1992). Specifically, it seeks to protect "endangered" or "threatened" species, that is, "any species which is in danger of extinction throughout all or a significant portion of its range" or "likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." 16 U.S.C. § 1532(6), (20). For species under the jurisdiction of the Secretary of the Interior, like the ocelot and jaguarundi, the Service administers the ESA. *See* 50 C.F.R. § 402.01(b); *see also Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 651 (2007).

gas to the global market and "result in a positive, permanent impact on the local economy" in Brownsville, Texas. Specifically, the proponents proposed to construct and operate a liquefied natural gas pipeline that will gather natural gas from existing pipelines using a 2.4-mile header system and 135.5 miles of dual pipeline through Cameron, Willacy, Kenedy, and Kleburg Counties in Texas (the "project" or the "Rio Grande project").[2] The project also involves a liquefied natural gas export terminal over 750.4 acres in Cameron County, Texas.

*2. The Ocelot and Jaguarundi*

As it turns out, the project would occupy land that is also home to the two species of cats at issue in this case: the ocelot and jaguarundi. The ocelot is an endangered cat whose range spans twenty-two countries "from extreme southern Texas and southern Arizona through the coastal lowlands of Mexico to Central America, Ecuador and northern Argentina." The United States, however, is home only to a small portion of the ocelot's range. There are approximately fifty ocelots left in the United States with two breeding populations in Cameron and Willacy Counties in Texas. Similarly, the Gulf Coast jaguarundi is another endangered cat whose range includes south Texas, though a jaguarundi has not been seen in south Texas in decades.

---

[2] We note at the outset that this project is separate and distinct from the Annova project, which involves the construction and operation of a liquefied natural gas terminal in Texas. We further recognize that there is a pending separate and distinct challenge under the Clean Water Act to a different agency action, No. 20-60281, in this court involving the Rio Grande project. But that challenge does not affect the finality or fitness for judicial disposition of the instant petition because the Service's biological opinion and incidental take statement, at issue here, constitute final agency action. *See Bennett v. Spear*, 520 U.S. 154, 178 (1997); *see also Nat'l Comm. for the New River, Inc. v. Fed. Energy Regul. Comm'n*, 373 F.3d 1323, 1329 (D.C. Cir. 2004) (noting that if "every aspect of [a] project were required to be finalized before any part of the project could move forward, it would be difficult, if not impossible, to construct the project") (citation omitted).

At present, the Service has worked to protect the ocelot and jaguarundi by maintaining three national wildlife refuges. Additionally, as relevant for the ocelot, the Service has worked to connect the Cameron County and Willacy County populations with each other and with populations in Mexico.

### 3. The ESA and the Federal Regulations

In a case such as this one, where the Service's biological opinion and incidental take statement are at issue, the court focuses its attention on Sections 7 and 9 of the ESA.

To start, Section 7(a)(2) requires that a federal agency consult with the Service to make sure that any authorized agency action "is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species."[3] 16 U.S.C. § 1536(a)(2); *see also* 50 C.F.R. § 402.14(a) (providing that formal consultation between the action agency and the Service is required where the action agency concludes in its initial review that its action "may affect listed species"). Once the Section 7 formal consultation concludes, the Service must then issue a biological opinion, "setting forth [its] opinion, and a summary of the information on which the opinion is based, detailing how the agency action affects the species," 16 U.S.C. § 1536(b)(3)(A), and using "the best scientific and commercial data available," *id.* § 1536(a)(2).

---

[3] The agency whose authorized action is at issue is referred to as the action agency while the Service is the "consulting agency." *See Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 524 F.3d 917, 924 (9th Cir. 2008). In this case, the Federal Energy Regulatory Commission ("FERC") is the action agency as it authorized the project.

No. 20-60299

If the Service concludes that the agency action is not likely to jeopardize the continued existence of the species but will result in some harm or harassment to the species—an incidental take[4]—then the opinion must also set out an incidental take statement. *See id.* § 1536(b)(4). This statement provides the permissible "amount or extent" of impact on the species from the action. 50 C.F.R. § 402.14(i). *See* 16 U.S.C. § 1536(b)(4). In other words, although Section 9 of the ESA prohibits takes of listed species, an incidental take statement renders such takes permissible as long as they occur in accordance with the incidental take statement's conditions. *See* 50 C.F.R. § 402.14(i)(5). And the conditions are "reasonable and prudent measures" designed to minimize the extent of the incidental take. *Id.* § 402.14(i)(1)(ii). Once the take limit specified in the statement has been exceeded, the action agency must re-initiate Section 7 consultation "immediately." *Id.* §§ 402.14(i)(4), 402.16(a).

*4. Agency Action*

The Service issued the opinion and incidental take statement in connection with FERC's authorization of the Rio Grande project. FERC authorized the project after conducting its environmental analysis, which involved soliciting public comment. From there, FERC prepared an environmental impact statement. Included in FERC's environmental impact statement was a discussion of the project's respective effects on the ocelot and jaguarundi. As part of this process, FERC consulted with the Service, both formally and informally.

In FERC's biological assessment of the project, it concluded that the project likely would have an adverse effect on the cats, and the Service agreed

---

[4] A "take" means "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19).

No. 20-60299

with this conclusion. As a result of this conclusion, formal consultation was required under the ESA. The Service reached its conclusion after it reviewed the proposed project, and in consultation with biologists, considered the project's potential effects on relevant endangered species—the ocelot and the jaguarundi. And the Service's biologists worked with FERC and the project's proponents to develop ways to mitigate any effects on the ocelot and jaguarundi. For example, the proponents committed to funding the acquisition of 1,050 acres of land and agreed to change the pipeline's alignment as well as the project's lighting plan.

After this careful review, the Service issued its opinion and determined that the project would not jeopardize the cats' continued existence, though it may have some adverse effects on the cats. Specifically, the Service determined that the project would likely harm or harass only one cat during construction and the life of the project, and this single "take" was simply not enough to jeopardize the cats' continued existence. The opinion also stated that if the take limit is exceeded, re-initiation of formal consultation is required by 50 C.F.R. § 402.16.

Petitioners Sierra Club and Defenders of Wildlife (collectively, "Petitioners"), however, contend that the opinion and incidental take statement are arbitrary and capricious. Specifically, they argue that there is no clearly defined "take" or trigger for re-initiation of formal consultation once the take of one ocelot or jaguarundi has occurred, and they challenge the Service's no-jeopardy conclusion.

## II.

The court reviews the incidental take statement and biological opinion under the same "narrow and highly deferential standard" set forth under the Administrative Procedure Act. *Medina Cnty. Env't Action Ass'n v. Surface Transp. Bd.*, 602 F.3d 687, 699 (5th Cir. 2010). And the court may not

overturn the Service's decision unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Further, the "court is not to substitute its judgment for that of the agency." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513 (2009) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). Rather, the court "consider[s] whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378 (1989) (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416 (1971)). And the court may nevertheless uphold an agency's decision even if it is "of less than ideal clarity," so long as "the agency's path may reasonably be discerned." *State Farm*, 463 U.S. at 43 (quoting *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974)).

## III.

We first turn to Petitioners' challenge to the incidental take statement. Second, we turn to Petitioners' challenge to the Service's no-jeopardy conclusion. As explained below, we reject these challenges because neither the incidental take statement nor the no-jeopardy conclusion is arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law.

*1. The Incidental Take Statement is Not Arbitrary and Capricious.*

Petitioners argue that the incidental take statement is arbitrary and capricious because it fails to (1) set a clear take limit, (2) set an enforceable trigger for re-initiation of formal consultation, and (3) include terms and conditions implementing certain of the reasonable and prudent measures designed to mitigate the effects of the project on the cats. We reject each argument in turn.

No. 20-60299

First, the incidental take statement clearly specifies the anticipated take of "one endangered cat, (ocelot or jaguarundi) . . . for construction and the life of the project." As such, the statement specifies "the amount or extent" of the anticipated take, which is all the regulations require. 50 C.F.R. § 402.14(i)(1)(i). Although Petitioners argue that this language in the incidental take statement is ambiguous, we disagree. The phrase "for construction"[5] means that the take of one ocelot could occur at the earliest during construction while "and the life of the project" delineates the rest of the timeline in which the take could occur. In other words, one take could occur anytime between when construction begins through the life of the project. Therefore, the statement sets a clear take limit.

The re-initiation trigger is similarly clear and enforceable. If the incidental take limit is exceeded, then FERC must re-initiate consultation immediately. *Id.* § 402.14(i)(4). The opinion's re-initiation notice specifies exactly that. If more than one cat is harmed or harassed, then the take limit is exceeded, and consultation must be re-initiated. True enough that the re-initiation notice *also* provides that in the specific instance where the take limit is exceeded by "vehicular mortality," i.e., road-kill, then FERC, the proponents, and the Service "will meet to discuss further options." But a plain reading of the re-initiation notice clarifies that such discussion is not in lieu of the required re-initiation of consultation. Rather, such discussion is simply one of the proponents' obligations while re-initiation is pending. In other words, in an instance where the take limit is exceeded by a construction or maintenance operation, "the operation causing such take must cease pending reinitiation"; where the take limit is instead exceeded by "vehicular

---

[5] That the summary of the incidental take statement uses the words "from the construction" similarly does not change our analysis.

mortality," the obligation pending re-initiation involves a separate discussion.

Further, contrary to Petitioners' argument, the requirement that a *discussion* with the Service must occur if a cat is killed during any twelve-month period does not alter the take limit of a single cat during the life of the project to one take per year. Rather, it merely governs the timing of discussion and, recognizing that a take need not be lethal, provides for discussion in the event that any cat dies in the project area. Once the take limit is *exceeded*, i.e., two cats are taken, re-initiation of formal consultation is necessarily triggered. *See id.* § 402.14(i)(4). But in the event of even *one* lethal take, which by itself would not exceed the take limit, the Service and the project's proponents will have a discussion. Even with these additional obligations, the statement nevertheless sets a clear and enforceable trigger for re-initiation of formal consultation.

Finally, Petitioners concede that their argument that the reasonable and prudent measures listed in the statement regarding voluntary conservation measures (specifically the land acquisition)[6] are not included word-for-word in the terms and conditions is partially moot. This is so because the land acquisition has already occurred.

To the extent that this argument is still live regarding the other voluntary conservation measures included in the first reasonable and prudent measure, the argument is unavailing for several reasons. To begin, the Service's Consultation Handbook expressly provides that where "conservation measures are part of the proposed action," implementing those measures is necessarily required "under the terms of the

---

[6] These measures include a voluntary land acquisition of 1,050 acres of ocelot and jaguarundi habitat.

consultation." *Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*, 698 F.3d 1101, 1114 (9th Cir. 2012) (following and adopting this very principle); *see* 50 C.F.R. § 402.14(i)(1)(i). These voluntary conservation measures were squarely included in the descriptions of the proposed project, and the Service required commitments on these measures before even initiating formal consultation. Additionally, the incidental take statement itself provides that these measures "are non-discretionary, and must be undertaken by [the proponents], so that they become binding conditions of the project." Further still, FERC's authorization requires the implementation of all voluntary conservation measures as part of its certification. Therefore, the failure to include the reasonable and prudent measures word-for-word in the terms and conditions does not render the incidental take statement arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law.

Based on the foregoing, we find no cause to overturn the agency's action based on the challenged incidental take statement.

*2. The No-Jeopardy Conclusion is Not Arbitrary and Capricious.*

Petitioners' overarching argument regarding the no-jeopardy conclusion depends on reading the Service's opinion as conclusory. In support of this reading, Petitioners maintain that the opinion fails to take account of (1) the Annova project (*see supra* note 2) and information used in the Annova project's biological opinion; (2) the effects of other projects when developing the so-called environmental baseline and their aggregate impacts; and (3) the effect of taking an additional cat on the species' survival. As explained below, we reject each of these arguments.

To start, under Section 7 of the ESA, once the Service concluded its formal consultation process with FERC regarding the project's effects on the endangered cats, the Service was required to issue a biological opinion, summarizing the information it is based on and discussing the project's

anticipated effects on the cats, including whether the project is "likely to jeopardize the [cats'] continued existence." 50 C.F.R. § 402.14(g). *See also id.* § 402.14(h)(iv)(h). And this conclusion was reached after evaluating both the direct and indirect effects of an action on the cats. *See id.* § 402.02(d) (defining the action area); *see also Oceana, Inc. v. Pritzker*, 75 F. Supp. 3d 469, 486 (D.D.C. 2014) (explaining that the Service, as the "expert agency charged with administering the ESA, may reasonably conclude that a given agency action, although likely to reduce the likelihood of a species' survival and recovery to some degree, would not be likely to jeopardize the continued existence of the species").

First, the Service's decision to omit the Annova project in this project's jeopardy analysis was not arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law. Indeed, the Service was effectively required to exclude the Annova project because Section 7 consultation regarding the Annova project had not yet concluded, and the environmental baseline instead must include only those projects that have already undergone such consultation. 50 C.F.R. § 402.02. Plainly, the Service does not include projects that have not yet undergone Section 7 consultation.

The Annova project was also properly excluded from the cumulative effects[7] analysis because, at the time of the opinion, the Annova project was a *federal* action subject to its own consultation. *Id.*; *see also Miccosukee Tribe of*

---

[7] "Cumulative effects" are defined as "those effects of future State or private activities, not involving Federal activities, that are reasonably certain to occur within the action area of the Federal action subject to consultation." 50 C.F.R. § 402.02(d). In formulating a biological opinion, the Service must determine whether the action, taken together with "cumulative effects to the environmental baseline and in light of the status of the species . . . is likely to jeopardize the continued existence of listed species." 50 C.F.R. § 402.14(g)(4).

*Indians v. United States*, 566 F.3d 1257, 1269 (11th Cir. 2009) ("Federal actions, and those involving federal agencies, are excluded from cumulative effects analysis because they are subject to their own consultation process."). Further, the proponents' pursuit of state permits does not render it a state action required to be considered as part of the cumulative effects analysis.

Additionally, the mere fact that the Annova project was included in FERC's environmental impact statement does not change our analysis because that statement was prepared under a different statute and a different standard. We recognize that the action area of the Annova project is in relatively close proximity to the action area of the Rio Grande project. But we reiterate that the Annova project's Section 7 consultation post-dates the Rio Grande project, and the Service does not include projects that have not yet undergone such consultation. Finally, Petitioners suggest that the Annova project opinion's data is "better" and thus should have been considered because it is the "best scientific and commercial data available," which the Service is required to use under 16 U.S.C. § 1536(a)(2). But this is yet another attempt to shoehorn the Annova project into the Rio Grande opinion. Nevertheless, "best scientific and commercial data" does not mean the data a party would have preferred. *Id.* § 1536(a)(2). To that end, that the information and studies considered in the Rio Grande opinion are not identical to those considered in the Annova opinion does not render the no-jeopardy conclusion arbitrary and capricious. To be sure, the Annova materials are not part of the record in this case. And we note at that we "may not consider evidence outside the administrative record." *Harris v. United States*, 19 F.3d 1090, 1096 n.7 (5th Cir. 1995).

Second, the Service's environmental baseline does not render its no-jeopardy conclusion arbitrary and capricious. Under the ESA's regulations, the Service is required to evaluate the "effects of the action" against an environmental baseline, which includes "the past and present impacts of all

Federal, State, or private actions and other human activities in the action area." 50 C.F.R. §§ 402.02, 402.14(g)(2). Here, the Service described and discussed the relevant ecosystems within the Rio Grande Delta region, the other federal actions in the area, the status of the cats and their habitat as well as what affects the cats' habitat. For example, the opinion discusses eleven other federal actions that "have resulted in formal section 7 consultations with the Service and the issuance of incidental take for the ocelot and jaguarundi within the action area." These actions involved widening and improving highways, installing a waterline, issuing launch licenses for heavy orbital or suborbital vehicles, and authorizing special permits for "experimentally grazing cattle treated with injectable acaricides, and feeding white-tailed deer ivermectin-treated corn from feeding stations," among others. The Service discussed the authorized take for these actions and explained that if all of the authorized takes occurred, then the ocelot population relevant to this petition would be "extirpated." But the Service went on to explain that to its knowledge, "no cats have been taken from any of the [discussed] projects."[8] *See id.* § 402.02 (explaining that the Service is required to consider the "past and present impacts" of federal actions in the area). We note, too, that a take is not necessarily lethal but rather includes actions that could "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or . . . attempt to engage in any such conduct." 16 U.S.C. § 1532(19). Indeed, in many of the discussed projects, lethal takes were not authorized.

Finally, there is no requirement that the Service provide a specific numerical analysis in lieu of a qualitative analysis regarding the effects of the projects on the species. *See* Interagency Cooperation—Endangered Species

---

[8] Further, as the Service points out in its brief, some of the projects are now completed and the authorized take has since expired.

Act of 1973, 51 Fed. Reg. 19,926, 19,932 (June 3, 1986) (codified at 50 C.F.R. pt. 402) (discussing that the agency should address "the totality of factors affecting the species"); *see also Gifford Pinchot Task Force v. U.S. Fish & Wildlife Serv.*, 378 F.3d 1059, 1067 (9th Cir. 2004) (explaining that "the ESA does not prescribe how the jeopardy prong is to be determined"), *superseded on other grounds by* Definition of Destruction or Adverse Modification of Critical Habitat, 81 Fed. Reg. 7214 (Feb. 11, 2016); *Mayo v. Jarvis*, 177 F. Supp. 3d 91, 138 (D.D.C. 2016) (noting that "nothing in the statute or regulation[s] requires the [Service] to rigidly add up each incidental take").

Based on this review, and the fact that the ESA does not define how to measure whether an action will in fact "jeopardize the continued existence" of the cats, the Service could make this no-jeopardy conclusion based on its own expertise. *See State Farm*, 463 U.S. at 43; *see also Pritzker*, 75 F. Supp. 3d at 486–87. And such determination provides us no occasion to overturn the agency's conclusions.

Third, the Service's analysis of the effect of taking an additional cat on the species' survival was not arbitrary and capricious. Here, the Service accounted for the effects of each project against the baseline and the cats' survival and recovery. Indeed, the Service provided a detailed analysis of direct effects of the project on the ocelot and jaguarundi such as habitat loss, human disturbance, operational noise, vehicle collisions, and light emissions. For example, human disturbance could discourage the ocelot's use of the action area, and a new access road could increase the risk of a vehicle collision with an ocelot. But in response to these concerns, proponents agreed to take certain actions to mitigate the risk. Regarding the risk of vehicle collisions, for instance, proponents agreed to mandate a 25 miles per hour speed limit. From there, the Service then concluded that the project "may harm or harass" an ocelot and "prevent[] dispersal of cats into otherwise suitable

No. 20-60299

habitat" but that this anticipated take would not likely jeopardize the cats "in the wild across their range."

To be sure, the regulations neither preclude all actions that will result in the take of an endangered species nor require a finding that the species will be jeopardized if there is a likelihood of a take. *See* 50 C.F.R. §§ 402.13(a), 402.14(b)(1) (discussing the type of consultation required and the Service's responsibilities but not requiring the Service to preclude actions that will harm an endangered species); *see also* 16 U.S.C. § 1536(b)(4).

Further still, the Service considered the effects of a natural gas interconnection, overhead transmission lines, an underground water supply, and wind energy projects as well as oil and gas development and the "rapid economic expansion of the large metropolitan areas."

At bottom, the Service considered all that it was required to consider—and much of what Petitioners argue that the Service failed to consider—except for what it was specifically allowed to omit.

Plainly put, the Service has identified the reasons underlying its conclusion that the ocelot and jaguarundi's continued existence would not be jeopardized by the project, and it has articulated a rational connection between these reasons and that conclusion. This is all that the ESA and its implementing regulations require. *See Luminant Generation Co. LLC v. EPA*, 714 F.3d 841, 850 (5th Cir. 2013); *see also Atchafalaya Basinkeeper v. U.S. Army Corps of Eng'rs*, 894 F.3d 692, 697 (5th Cir. 2018).

Therefore, the Service's opinion was not arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law.

## IV.

For the foregoing reasons, we DENY the petition.